COMMONWEALTH vs. PATRICK W. TRACY
(and three companion cases [1]).

No. 88-P-763.

Norfolk. February 16, 1989. — June 19, 1989.

Present: DREBEN, SMITH, & WARNER, JJ.

*Robbery. Insanity. Practice, Criminal,* Disclosure of evidence, Fair trial,
Examination of jurors, Argument by prosecutor, Instructions to jury.
*Evidence,* Other offense, Admissions and confessions, Consciousness
of guilt, Value.

At the trial of indictments for armed robbery and for unlawfully carrying a
firearm, the evidence was sufficient to permit the jury to find that one
defendant, who drove the getaway car after his codefendant robbed the
manager of a supermarket at gunpoint, actively participated in the venture
and knew that the codefendant had a gun. [457-458]

Failure of the prosecution to furnish defendants with police booking state-
ments prepared at the time of their arrest, as considered with reference
to certain extraneous writing on one of the slips, was not a breach of a
pretrial discovery agreement to provide the defendants with their written
or recorded statements. [460]

At a criminal trial, the admission in evidence of a police booking slip, on
which appeared extraneous handwriting that arguably referred to a de-
fendant's commission of a prior offense and that evidently had passed
unnoticed by all counsel in the case, was not so prejudicial as to give
rise to a substantial risk of a miscarriage of justice; moreover, the judge,
in his discretion, properly denied that defendant's motion for a new trial
based on that ground. [460-463]

At a criminal trial, testimony concerning statements made by a defendant in
a telephone call placed from the booking area of a police station, and
within earshot of police, was properly admitted. [463-464]

A defendant at a criminal trial demonstrated no prejudice from the decision of
the judge, after initially questioning prospective jurors individually, to
expedite the selection process by questioning them in groups of five.
[464-465]

---

[1] One of the companion cases is against Tracy and two are against Thomas
A. Magee.

The judge at a criminal trial acted within his discretion in dismissing for
cause two prospective jurors. [465]

A prosecutor's statement during closing argument, mischaracterizing a pass-
age from a medical diagnostic manual, was harmless where a defendant's
claim of insanity by reason of post-traumatic stress disorder did not
seriously purport to cover the two offenses of which he was convicted
and where he was acquitted by reason of insanity on a charge of armed
robbery arising from his conduct while allegedly in a sudden "disas-
sociated state." [465-467]

A defendant convicted of receiving stolen property of a value exceeding one
hundred dollars, namely, a certain gun, was to be resentenced as upon
a verdict of guilty of receiving stolen property of a value less than that
amount, where, although the gun was in evidence, the jury heard no
testimony as to its value and had received no instruction that they must
find the value of the gun exceeded one hundred dollars. [467]

INDICTMENTS found and returned in the Superior Court De-
partment on June 25, 1986.

The cases were tried before *George N. Hurd, Jr.,* J., and
a motion for a new trial was heard by him.

*Brownlow M. Speer,* Committee for Public Counsel Serv-
ices, for Thomas A. Magee.

*Elliot R. Levine* for Patrick W. Tracy.

*James Lang,* Assistant District Attorney, for the Common-
wealth.

DREBEN, J. A few minutes before 9:00 P.M., on May 9,
1986, as the Triple A Supermarket in Needham was about to
close, Patrick Tracy entered the market, asked for the manager,
and held him up at gunpoint. Tracy left with about $5,600 in
cash. Responding to a radio dispatch about the armed robbery,
the police at first followed and then engaged in a 4.9 mile
chase of a green Ford LTD whose driver refused to pull over.
Pursued at times by four police cruisers with flashing lights
and activated sirens, the Ford hit three cars before it stopped.
Halfway through the chase, the gun used in the robbery was
thrown from the vehicle.

Tracy, the owner of the Ford, and Magee, the driver, were
arrested. They were each charged with armed robbery, carrying
a firearm, and receiving stolen property. At trial, Tracy, a

Vietnam veteran, presented an insanity defense based on post-traumatic stress disorder. He was acquitted of armed robbery by reason of insanity but was convicted of carrying a firearm and receiving stolen property (the gun). Magee was found guilty of armed robbery and of carrying a firearm but was found not guilty of receiving stolen property.

Each defendant raises a number of issues. We shall first discuss those separately argued by Magee. Where relevant, additional facts, which the jury could have found, will be supplied.

*Magee's Appeal.*

1. *Claim of insufficient evidence.* Relying on *Commonwealth* v. *Fickett*, 403 Mass. 194, 196-198 (1988), Magee correctly points out that to support his conviction on a theory of joint venture, the Commonwealth had to prove that he knew that Tracy had a gun. He claims there was insufficient evidence to show such knowledge and hence to warrant his conviction of armed robbery and of carrying a firearm.[2]

Unlike the situation in *Fickett*, however, where the victim was intoxicated and hence an easy target for a robbery without a weapon, a robbery of a store is a different undertaking. It can be expected that a number of people will be present and that a means must be found to persuade the intended victim to part with his money. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974) ("a person joining in a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actor[ ] might be furnished with [a] weapon[ ]"). See also *United States* v. *Sanborn*, 563 F.2d 488, 490 (1st Cir. 1977).

There was other evidence from which the jury could infer knowledge of the gun. Magee was the driver of the getaway vehicle after the armed robbery. In such circumstances, both

---

[2] Magee did not move for a required finding of not guilty until the close of the defendants' cases. We may, therefore, draw on all the evidence presented at trial. See *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 & n.1 (1976); *United States* v. *Buras,* 633 F.2d 1356, 1359 (9th Cir. 1980). While neither defendant took the stand, Tracy's experts, a psychologist and a psychiatrist, testified (without objection) as to Tracy's account.

the Supreme Judicial Court and this court have been "unwilling to adopt a rule which would create artificial barriers against inferences of complicity which may naturally be drawn against one found present in a getaway car during or shortly after an armed robbery." *Commonwealth* v. *Giang*, 402 Mass. 604, 609 (1988), quoting from *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32-33 (1976). Such inferences are even more natural where, as here, the defendant engaged in a high-speed police chase, and the gun and some of the money were thrown from the car. In addition, Magee and Tracy were long-time friends and had spent the afternoon together prior to the robbery, a time when they had an opportunity to plan the undertaking. Tracy, who had driven to the store, did not park in front of the market or in its parking lot, but left the vehicle, with Magee inside, farther away where the Ford could not be seen by persons in the market. In effecting the robbery, Tracy wore (in May) a heavy pea coat and white garden gloves and carried the gun into the store hidden in, or under, a paper bag. The .38 caliber Smith & Wesson weapon was in evidence, and the jury saw its size.

While there was no direct evidence that Magee knew of the gun, we consider the evidence sufficient, under the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979), to warrant findings by the jury that Magee actively participated in the venture, knew what Tracy was wearing, and knew that a gun was involved. The judge did not err in denying Magee's motion for a required finding of not guilty.

There is also no merit in Magee's contention that there was insufficient evidence against him in light of the other verdicts returned by the jury. That one defendant is found to be insane does not shield a responsible participant, *Commonwealth* v. *McGrath*, 358 Mass. 314, 321 (1970), and inconsistency will not render verdicts of guilty erroneous. *Commonwealth* v. *Sherry*, 386 Mass. 682, 698 (1982).

2. *Extraneous matter on booking slip.* After Magee was arrested and brought to the Needham police station, Officer Hunt, the policeman on duty, filled out a yellow booking slip for each defendant. The slips were admitted in evidence over

objection. The Commonwealth urged that Tracy's slip was relevant to show that, despite his claim of insanity, Tracy could, within half an hour of his arrest, answer questions with clarity. Counsel for Magee objected on the ground that he had not been shown the slips and that since Magee's slip contained his statements, there was a breach of the pretrial discovery agreement.[3] Magee claims that he was prejudiced by this breach and that, in any event, the introduction of the slips was so fundamentally unfair that his motion for a new trial should have been allowed.

The slips listed the defendants' answers to routine questions such as name, address, height, etc. The Commonwealth had agreed in a pretrial conference report to provide the "written or recorded statements of defendant." The conference report also stated that the Commonwealth would allow the defendant to inspect material and relevant physical evidence and documents "at Needham Police Dept. at mutually agreeable time." The booking slips were not delivered to the defendants prior to trial and it does not appear that either defense counsel went to the police department to inspect any material.

Magee's booking slip, a copy of which is set forth in the appendix to this opinion, caused the defendant a twofold problem. The first difficulty, elicited by his own counsel, relates to the words "Coolidge House," written on the side of the slip. On cross-examination Officer Hunt testified that Coolidge House was a halfway house. At counsel's request, the judge gave a cautionary instruction that the jury were not to draw an unfavorable inference from the address and that there are many reasons why people are residents of halfway houses.[4]

---

[3] He also made a *Miranda* claim which is not pursued in this court.

[4] Officer Hunt testified at the end of the third day of trial. The next day counsel for Magee unsuccessfully moved for a mistrial, joined in by Tracy, on the ground that the evidence as to a halfway house, together with the other evidence discussed in part 3 below, indicated that Magee had a prior record. At that time, counsel also made a fleeting reference to relevance. Magee does not claim error in the denial of a mistrial, apparently recognizing that the judge's cautionary instruction was sufficient to cure any harm from evidence erroneously elicited in Officer Hunt's testimony and that there was no abuse of discretion in the denial of the mistrial. See *Commonwealth*

The second, and more serious, was not noticed by counsel until three days after the jury returned their verdict and was the basis for Magee's motion for a new trial. On the slip, in the space listed for offense, after setting forth in large bold letters "C. 265 § 17 ARMED ROBBERY WITH A DANGER-OUS WEAPON," there appears interlineated in much smaller and much less legible writing the following notation:

> "2 [5] c. 265 § 18B committing an offense while using a firearm (2nd offense)."

The difficult question is whether a new trial is required. Quite apart from any prejudicial material, it was error to admit Magee's booking slip in evidence as it was not relevant to any issue at trial. But that ground was not urged prior to its admission, see note 4, *supra*, nor, of course, was there any objection to the then unnoticed offending material.

Contrary to the defendant's contention, the Commonwealth was not in violation of the discovery agreement to produce the defendants' statements. Even if the routine answers on the booking slips are characterized as statements of the defendants, the notation at issue was not such a statement. While it might have been better practice to produce the slips, the failure to do so was not a breach of the pretrial agreement.

The defendant claims that the slip clearly shows that Magee had a criminal record, and "[i]t is all too easy for a jury to surmise that if a defendant earlier committed a crime, he probably committed the crime for which he is being tried, particularly if the crimes are similar." *Commonwealth* v. *Guilfoyle*, 396 Mass. 1003, 1004 (1985). In sum, he claims the trial was fundamentally unfair.

The standard for our review is whether there is a substantial risk of a miscarriage of justice, as no correct ground for the exclusion of the booking slip was given to the trial judge. See

v. *Hoffer,* 375 Mass. 369, 372-373 (1978); *Commonwealth* v. *Simmonds,* 386 Mass. 234, 241 (1982).

[5] The notation may begin with a 2 in a circle but that is not clear. See appendix.

*Commonwealth* v. *Clark,* 23 Mass. App. 375, 381 (1987). See also *Commonwealth* v. *Ford,* 397 Mass. 298, 302 (1986), where a specific objection to the extraneous material on a conviction record was made. See same case in this court, 20 Mass. App. Ct. 575, 579 (1985). Since Magee also moved for a new trial, we consider, as well, whether the judge abused his discretion in applying the standard under Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979) ("if it appears that justice may not have been done"). See *Commonwealth* v. *Stout,* 356 Mass. 237, 242 (1969).

The question, therefore, is the degree of prejudice. Although counsel may not have had much time to look at the booking slip prior to its introduction, he extensively cross-examined Officer Hunt about the addresses on it. His motion for a mistrial was not made until the next day, and then only on the basis of the halfway house reference. He thus had ample time to examine the slip, yet as Magee's appellate counsel states in his brief, the "prejudicial notation escaped defense counsel's observation until after the conclusion of the trial."

Had the prejudice been as obvious as counsel·on appeal posits, it is unlikely to have escaped the attention of trial counsel for Magee, who, throughout the trial, diligently objected to any reference to Magee's prior record. Its import also escaped the attention of counsel for Tracy[6] and the prosecutor,[7] despite their focus on the admission of the booking slips.

Not only was the reference unnoticed by experienced counsel, but the "2nd offense" notation does not unambiguously indicate a prior criminal record to a lay jury. What followed the first listed offense was written in smaller, less legible, letters, and appears to have a number "2" in front of it. The

---

[6] Counsel for Tracy joined in the motion for a mistrial, see note 4, *supra,* on the question of the reference to a halfway house, arguing that Tracy, too, was hurt by any suggestion that Magee had a criminal record.

[7] We assume the prosecutor did not deliberately withhold knowledge of the notation, thereby risking a reversal or a new trial. It appears from the transcript that he, too, had not seen the booking slips until brought to court by the police the morning the slips were introduced in evidence.

offense was not one on which Magee was indicted and was not before the jury. The Commonwealth, in its brief, urges that it is unlikely that a lay jury would have concluded from the notation that Magee had a prior criminal record "because there is a more readily apparent 'innocent' explanation," namely that the term "2nd offense" refers to a second offense with which Magee was being charged as a result of the armed robbery of the supermarket.

An analysis of the facts of another case where the Supreme Judicial Court, because of the equivocal nature of an allegedly prejudicial statement, found that there was no abuse of discretion by the trial judge in denying a mistrial may be of assistance in considering the prejudice here. In *Commonwealth* v. *Simmonds*, 386 Mass. 234, 240-241 (1982), the defendant was charged, among other crimes, with assault with intent to rape. A police officer, in response to questioning concerning a conversation he had had with the defendant after a lineup, responded that the defendant knew that "he had already been picked out in the lineup as an individual that had assaulted one party and raped her and attempted. . . ."[1] [8]" In holding that the denial by the trial judge of the defendant's motion for a mistrial was not an abuse of discretion, the Supreme Judicial Court stated, at 241, "Since one of the crimes involved in this case was assault with intent to rape and since this comment is an obscure one, we are not convinced that its admission 'could have appreciably influenced the jury or tainted their verdict.' *Commonwealth* v. *Vanetzian*, 350 Mass. 491, 495 (1966). *Commonwealth* v. *Billings*, 6 Mass. App. Ct. 884 (1978)."

In the case at bar, the notation on the booking slip is no less obscure. We note, too, that the slip was one of eighteen exhibits and that the notation was never mentioned at trial, its import having escaped all counsel.

In assessing whether there is a substantial risk of a miscarriage of justice, we also consider the evidence against Magee,

---

[8] The court's footnote 1 states: "A woman, seventy-six years old, who had been raped earlier the same night as the attack on the victim had picked out the defendant's photograph, identifying him as her assailant." 386 Mass. at 240.

see part 1, *supra,* and the nature of his defense. Neither he nor Tracy testified at trial, but the psychologist and psychiatrist, see note 2, *supra,* recounted Tracy's version, which was that he had forced Magee, at gunpoint, to drive the escape vehicle. The argument, put forcefully by Magee's counsel in closing, was that Magee "was terrified of a crazy guy with a gun" and "what followed thereafter was a panic."

The jury rejected the coercion story, influenced no doubt by the significant fact that midway through the almost five-mile chase, the gun was thrown from the car. In view of this problem with Magee's coercion defense, the obscure meaning of the notation, and the fact that it escaped the notice of all counsel, we "are not convinced that [the booking slip's] admission 'could have appreciably influenced the jury or tainted their verdict.'" *Commonwealth* v. *Simmonds,* 386 Mass. at 241. We conclude that there is not here a substantial risk of a miscarriage of justice.

There was also no abuse of discretion on the part of the motion judge in denying the motion for a new trial. Mass.R.Crim.P. 30(b). Since he had also been the trial judge, he was entitled to use his knowledge of the trial and his evaluation of the witnesses and evidence to assess the nature of the prejudice claimed. See *Commonwealth* v. *Markham,* 10 Mass. App. Ct. 651, 652 (1980).

3. *Magee's telephone conversation.* Before trial, Magee filed a motion in limine to exclude evidence of his statements in a telephone call he placed from the booking area of the police station on the day of his arrest. The motion was denied, and Officer Droney who had overheard the conversation testified as follows to Magee's side of the conversation:

> "I heard suspect Magee say into the phone, 'Hi, Ma. I'm in big trouble.' There was a pause. He then stated, 'At the Needham Police Station.' There was a pause again, he stated, 'A supermarket, but I didn't go in the store. I stayed in the car.' A pause again and he stated, 'Just a fluke.' Again a pause, 'I'll find out Monday, and *I'll probably be going behind the wall at Concord*'" (emphasis supplied).

Magee urges that the italicized statement indicates that he had a prior criminal record. In this instance, too, the words are ambiguous. Even if, as the defendant urges, they imply a prior record, they were relevant to show Magee's consciousness of guilt, *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 52 (1975); *Commonwealth* v. *Roberts*, 378 Mass. 116, 125 (1979), and therefore admissible. In any event, the defendant, without any request or desire for privacy, chose to make statements on a telephone which was located within earshot of the police. The statements were thus made voluntarily and were admissible. *Commonwealth* v. *Signorine*, 404 Mass. 400, 409 (1989).

*Tracy's Appeal.*[9]

4. *Jury selection process.* Tracy argues that he was prejudiced by the judge's sua sponte change in the method of questioning jurors. He also claims that, contrary to the requirements of *Commonwealth* v. *Dickerson*, 372 Mass. 783, 795 (1977), the judge, without reason, dismissed two prospective jurors.

4(a). On the first day of jury empanelment, the judge asked each of the venire members, individually, questions, apparently requested by Tracy, concerning the juror's attitude toward an insanity defense and toward the Vietnam War. When the first venire was exhausted, in order to speed the selection process, the judge questioned jurors in groups of five over the objection of both defendants.

Recognizing that *Commonwealth* v. *Estremera*, 383 Mass. 382, 388 (1981), holds that a defendant does not have the right to require pretrial questioning concerning the defense of criminal responsibility, and that a judge may modify the empanelment process to speed up the proceedings, *id.* at 389, Tracy attempts to show prejudice. He claims that he "likely would have exercised" fewer peremptory challenges on the first day had he known that, due to the group questioning, he would have less opportunity to observe the jurors on the second day. However, as pointed out in *Commonwealth* v. *Campbell*, 378

---

[9] Magee also joins in those parts of Tracy's appeal which claim error in the jury selection process and in the prosecutor's argument.

Mass. 680, 696 (1979), "the deprivation of an opportunity for observing a prospective juror's demeanor" because of collective questioning "lacks legal significance." Moreover, the claim of prejudice also fails because Tracy still had a number of unused peremptory challenges after the selection of jurors was completed.

4(b). *Commonwealth* v. *Dickerson*, 372 Mass. at 795, emphasizes "the importance of a trial judge's establishing on the record the cause for excusing a juror." Here, contrary to the defendants' contention, the cause appears. Both of the excused venire members had heard a third prospective juror question the validity of the insanity defense. The judge obviously thought that the remaining two prospective jurors may have been adversely influenced by hearing this statement. The dismissals were within the "substantial range of discretion" of a trial judge in determining the suitability of prospective jurors. *Id.* at 794.[10]

5. *Prosecutor's misstatement.* Tracy's defense, it will be recalled, was insanity by reason of the mental disease of post-traumatic stress disorder. His experts referred to a diagnostic manual (DSM-III-R) in which the criteria for diagnosis of this disease appear. That manual contained a cautionary instruction, set forth in the margin,[11] which was read to the jury by the Commonwealth's psychiatrist on redirect examination.

In closing argument, the prosecutor asked:

"And do you remember I gave him that book and he turned to a page and I said 'Would you read it to the jury?' And he read to you that this book, this Bible of

---

[10] We also note that neither defendant objected to the dismissal of the two jurors.

[11] "The reader is directed to the cautionary statement appearing following this introduction that amplifies three points. The proper use of the DSM-III-R requires specialized clinical training. Conditions not included in the DSM-III-R classification may be legitimate subjects of treatment and research efforts. And the clinical and scientific considerations that were the bases of DSM-III-R classification and diagnostic criteria may not be relevant to considerations in which DSM-III-R is used outside of clinical or research settings, e.g., in legal determinations."

the profession, should not be used if you're going to make a diagnosis that's going to be used in a legal proceeding. Should not be used in a legal proceeding."

The prosecutor continued:

"Well, I submit to you this is a legal proceeding. Those men knew they shouldn't use the book. They went ahead and did. Dr. Kean [Tracy's psychologist expert] says he wrote part of the book. He knew that book should not be used in a legal proceeding and he went ahead and did it. His diagnosis came from there. Dr. Kalb's [Tracy's psychiatric expert] diagnosis came from there . . . . Let me leave that with you."

At the conclusion of the prosecutor's argument, Tracy's counsel requested that the judge permit counsel to make a reasonable interpretation of the manual's cautionary instruction to the jury or that the judge do so in his charge. Both requests were denied. Assuming the prosecutor's remarks were improper, the error was harmless. The whole thrust of Tracy's expert testimony was that Tracy had a sudden "disassociated state." According to the experts' testimony, Tracy had left the automobile to buy cigarettes at the supermarket. While walking to the store from his car, he passed a funeral parlor which triggered a flashback reminding him of his experience folding flags for the caskets of men killed in Vietnam. This memory revived other memories which, in combination with current stressful events,[12] caused him to be in a "disassociated state" and hence incapable of controlling his actions when he entered the store and committed the armed robbery. The experts did not testify that Tracy was constantly in a "disassociated state." To the contrary, this was a sudden, albeit recurring, syndrome.

---

[12] Tracy's girlfriend had ended their relationship on the day before the robbery, and the day of the robbery was the exact anniversary of Tracy's "DEROS date," that is, his expected date of return from overseas.

The carrying of the stolen gun was not part of the sudden flashback. Tracy carried the gun when he left the vehicle. There was evidence from his former girlfriend that he had had a gun for at least two weeks prior to the robbery, and the owner of the gun testified that the gun had been stolen more than six months prior to the supermarket incident.

The jury acquitted Tracy of armed robbery by reason of insanity but found him guilty of carrying a gun and receiving stolen property (the gun). Since the insanity defense did not seriously purport to cover Tracy's actions at times when he was not in a "disassociated state," we consider the prosecutor's mischaracterization of the cautionary instruction harmless.

6. *Value of the gun.* Although the gun was in evidence, there was no testimony as to its value. In addition, the judge in his charge did not instruct the jury that they had to find that the gun's value was in excess of one hundred dollars. We do not consider that the common experience of jurors enables them to assess the value of a gun, compare *Commonwealth* v. *Hosman*, 257 Mass. 379, 386 (1926), and Tracy did not admit that its value exceeded $100. Compare *Commonwealth* v. *Camelio*, 1 Mass. App. Ct. 296, 302 (1973).

The value of the property stolen determines the punishable offense under G. L. c. 266, § 60. Even in the absence of a request, the jury must be instructed on this point. *Commonwealth* v. *Walters*, 12 Mass. App. Ct. 389, 394 (1981).[13] For the reason that there was no evidence of value, and on the additional ground that there was no instruction that the jury must find that the value of the gun exceeded one hundred dollars, it was error to sentence Tracy for the more serious offense. The defendant must be resentenced. *Id.* at 395. See *Commonwealth* v. *Lawless*, 103 Mass. 425, 432-434 (1869). See also *Commonwealth* v. *Kelly*, 24 Mass. App. Ct. 181, 185 & n.4.

---

[13] Examination of the record in *Commonwealth* v. *Walters* indicates there was no objection to the failure to charge on the value of the property in that case. See *Nantucket Conservation Foundation, Inc.* v. *Russell Management, Inc.*, 2 Mass. App. Ct. 868, 868-869 (1974) (court may take judicial notice of the record of a case).

The judgments as to Magee are affirmed. As to Tracy, the judgment on the indictment for unlawfully carrying a firearm is affirmed, but the judgment on the indictment charging him with receiving stolen property is vacated, and the case is remanded to the Superior Court for resentencing of Tracy upon a verdict of guilty of receiving stolen property not in excess of one hundred dollars.

*So ordered.*