## Commonwealth *vs.* Joseph T. Netto
### (and three companion cases[1]).

Bristol. October 11, 2002. - February 14, 2003.

Present: Marshall, C.J., Greaney, Cowin, Sosman, & Cordy, JJ.

*Constitutional Law,* Search and seizure, Probable cause. *Search and Seizure,* Arrest, Probable cause, Expectation of privacy. *Arrest. Probable Cause. Joint Enterprise. Practice, Criminal,* Lesser included offense, Voluntariness of statement, Instructions to jury, Capital case. *Homicide. Felony-Murder Rule. Robbery.*

A search of a motel room in which certain items were noticed by police while the defendants were present, but in which such items were not seized until after the defendants had been taken from the room, was valid as a search incident to arrest, where the items seized were near at hand in the room where the defendants had been arrested, and where the police had probable cause to believe that those items contained evidence of the crimes for which the defendants were arrested [694-696]; in addition, the defendants failed to establish that there was any "search" of the room in a constitutional sense when motel personnel called the police the next day and asked them to retrieve other items from the room belonging to the defendants, where the defendants no longer had a reasonable expectation of privacy with respect to items left in the motel room that had been abandoned due to their arrest on murder charges [696-699].

A judge in a murder case did not err in not conducting a voir dire to determine the voluntariness of the defendant's statement to another in which he predicted that the victim would "end up with a knife in his back." [699-700]

At a murder trial, there was sufficient evidence to submit the case to the jury on theories of both principal and joint venture liability, and the fact that the Commonwealth did not present evidence identifying one coventurer as the one who stabbed the victim did not preclude the Commonwealth from pursuing a theory of joint venture liability as to a second defendant. [700-701]

At a murder trial, there was sufficient evidence of a defendant's presence, knowledge of a weapon, and participation in the crime to warrant a conviction of felony-murder as a joint venturer predicated on armed robbery. [701-704]

At a murder trial in which defense counsel made no request with respect to jury instructions on any lesser included offenses, the judge expressly noted the absence of any such requests, and the judge recognized that there were

---

[1]Two against Nancy J. Netto and one against Joseph T. Netto.

valid strategic reasons for not making the requests, there was no substantial likelihood of a miscarriage of justice created by the judge's not instructing the jury on the lesser included offense of unarmed robbery and not instructing on felony-murder predicated on an unarmed robbery, where defense counsel's failure to request such an instruction, or to make an objection to the instructions on the issue, was a reasonable tactical decision. [704-707]

INDICTMENTS found and returned in the Superior Court Department on December 1, 1993.

A pretrial motion to suppress evidence was heard by *Richard J. Chin*, J.

An application for an interlocutory appeal was allowed by *Nolan*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

Following review by the Appeals Court, 39 Mass. App. Ct. 1123 (1996), and the denial by this court of the defendant's application for further appellate review, 422 Mass. 1104 (1996), the cases were tried before *Charles J. Hely*, J.

*Steven J. Rappaport* for Nancy J. Netto.

*Charles W. Rankin* for Joseph T. Netto.

*Sharon L. Sullivan-Puccini*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendants were convicted of armed robbery and murder in the first degree in connection with the stabbing death of their next door neighbor. The murder indictments were submitted to the jury on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder (predicated on armed robbery). The jury found Joseph Netto guilty on all three theories. Nancy Netto was convicted only on the theory of felony-murder. Both defendants now appeal from their convictions, and ask that we exercise our power under G. L. c. 278, § 33E, to reverse the convictions or reduce the degree of guilt on the murder convictions. For the following reasons, we affirm Joseph Netto's conviction of armed robbery, we vacate as duplicative Nancy Netto's conviction of armed robbery,[2] we affirm both murder convictions, and we decline to exercise our power under G. L. c. 278, § 33E.

---

[2]As to Nancy Netto, the Commonwealth concedes that the conviction of armed robbery is duplicative of the felony-murder conviction and that the armed robbery conviction must therefore be vacated.

1. *Facts.* Viewed in the light most favorable to the Commonwealth, the facts are as follows. The victim, Robert Levesque, lived alone in a second-floor apartment at 837 Second Street in Fall River. He operated a restaurant located nearby, and was known to carry a significant amount of cash on his person. He also loaned money to many people, taking as pledges various items of personal property. As a result, he possessed a quantity of jewelry, belonging either to himself or to persons who owed him money.

The defendants, Joseph and Nancy Netto, husband and wife, lived in the apartment next to Levesque, having moved in only a few weeks prior to Levesque's murder. Another apartment on the second floor was occupied by Michelle Griffin and Bennie White, who were friends of the Nettos. The Nettos were impoverished and addicted to heroin. They had few possessions and, much of the time, no food. They received a Social Security check at the beginning of each month, but spent most of the little money they had on heroin.

Levesque had helped the Nettos acquire their apartment and, for some brief period after they moved in, the Nettos had been on friendly terms with Levesque. Nancy Netto would visit Levesque in his apartment on occasion. However, approximately one week prior to his murder, there had been some friction between Levesque and Nancy Netto; as a result, she was no longer welcome in his apartment.[3] At some point prior to the murder, Joseph Netto told Bennie White that he did not like Levesque, predicting that Levesque would "end up with a knife in his back."

On November 18, 1993, the day before the murder, the police were summoned to the Nettos' apartment in response to a report of some disturbance. Joseph Netto mistakenly believed that it was Levesque who had telephoned the police,[4] and Joseph Netto expressed anger that Levesque had done so.

As of the next morning, Friday, November 19, the Nettos

---

[3]The Commonwealth attempted to introduce evidence that the reason for that friction was Levesque's suspicion that Nancy Netto was trying to steal things from him, but the judge sustained the defendants' objection to that evidence.

[4]In fact, it was Bennie White who had telephoned the police, not Levesque.

were in desperate need of money for heroin. Nancy Netto was described as "very dope sick," suffering withdrawal to the point that she was drooling. She asked Griffin and White for money, telling them that she had not eaten in three days. She promised to pay them back when her next Social Security check arrived. Both Griffin and White refused to lend her any money. She asked to use their telephone (as the Nettos had no telephone in their apartment), and Griffin overheard her making telephone calls to other friends in a vain effort to obtain money from them.

In the late afternoon, Levesque had closed up his restaurant and stopped in at a local club that he often patronized. At the club, he was seen with significant cash, including many one hundred dollar bills. He left the club at approximately 5:30 P.M. Sometime shortly thereafter, a neighbor in the apartment below Levesque's heard loud noises coming from Levesque's apartment. She heard men's voices yelling, the sounds of furniture being moved, and objects breaking. There was then a loud crash on the floor. Next, she heard rapid footsteps going in and out of Levesque's apartment, up and down the stairway, and in and out the building's front door. Over the course of the evening, she also heard foot traffic going from Levesque's apartment toward the back of the building, where the Nettos' apartment was located.

At approximately 6 P.M., Nancy Netto telephoned a friend, one John Costanzo, asking him to come over and give her a ride. Sometime later, Costanzo arrived at the defendants' apartment, where he saw Joseph Netto with several one hundred dollar bills in his hands. On seeing the money, Costanzo asked to be paid back on an earlier loan. Joseph Netto said that the money was not his, and that he would repay Costanzo in a few days. Costanzo then drove Nancy Netto to Providence, where she purchased at least twenty bags of heroin, costing approximately $140. She also bought cigarettes and gave Costanzo twenty dollars for gasoline.

While they were out, Michelle Griffin stopped in briefly at the Nettos' apartment. Joseph Netto was there, barefoot and wearing nothing but shorts. Griffin saw miscellaneous items on the kitchen table, which was odd because the Nettos had very

few possessions. After Griffin left, White also stopped in at the Nettos' apartment. White noticed that Joseph Netto had a cut on his hand that he appeared to be treating. There were bottles of "expensive" liquor on the table, and a basket of other items. Towels and clothing were soaking in the bathroom sink and tub. White asked Joseph Netto where the liquor had come from. Joseph replied that he had stolen it from his brother-in-law's basement. He offered one of the bottles to White, telling him not to tell Griffin about it. White asked him about the cut on his hand. Joseph replied that he had been cut during the theft. While White was still there, Nancy Netto and Costanzo returned from their heroin-buying trip. The Nettos each injected some heroin, and gave a bag to White.

Costanzo left, at which point Nancy Netto asked White to give her a ride to buy groceries. As they were about to leave, Joseph Netto reminded White that he was not to say anything to Griffin about the bottle of liquor he had been given. On hearing this remark, Nancy Netto "went out of her mind," screaming to Joseph that he "[was not] supposed to tell anyone" and that she "[could not] believe [he] said anything." Joseph took her into the bedroom to calm her down. When they came back out, Joseph asked Nancy where the money was. She told him that she had "stashed it," but could not remember where. They then found the money in the bedroom, and White and Nancy Netto left to buy groceries.

White took Nancy Netto to two different stores, at which she spent approximately one hundred dollars on groceries. While they were out, Griffin, from her own apartment on the second floor, heard "banging around, clattering, scuffling" noises from Levesque's apartment. After the noises had gone on for quite some time, she heard a loud "thump," which prompted her to go out and investigate. She saw that the Nettos' apartment door was slightly open, and, as she approached that door, Joseph Netto came up behind her in the hallway. He was still barefoot and dressed only in shorts. Joseph asked her if she had heard noises in Levesque's apartment. When Griffin replied that she had, Joseph took her arm and directed her into his own apartment. Griffin asked him if Nancy and White were back, to

which Joseph replied that Nancy had a great deal of money to spend and would be out for a while. Griffin was uneasy and wanted to leave, but Joseph kept his hold on her arm and asked her to wait for Nancy and White to return.

Nancy and White did return shortly thereafter, loaded with grocery bags. Griffin had never seen the Nettos buy such a quantity of groceries before. When Joseph suggested that they give some of the groceries to Griffin and White, Nancy protested that she had not eaten in three days and that they were "her groceries." Griffin and White left and returned to their own apartment.

At approximately 6 A.M. the next day, the Nettos went to Costanzo's home, inviting him to go out for coffee. Costanzo declined. Later that morning, the Nettos rented a room at a motel located a few miles from their home. They paid for the room in cash. One of the motel workers who knew Nancy Netto struck up a conversation with her. Nancy and Joseph both explained that their apartment was being painted and that they had come to the motel to escape the paint fumes. They had bags of items with them, which they claimed to have bought at a second-hand store.

When Levesque failed to show up at his restaurant at the usual time that Saturday morning, one of the restaurant workers went to his home. Discovering Levesque's vehicle in the lot, and getting no response from knocking on his door, she telephoned the police. The police broke down the door to Levesque's apartment and found his body lying ten feet inside the doorway with a knife sticking out of his back. He had been stabbed nineteen times. He had also suffered multiple cuts in the nature of defensive wounds, and a blow from a blunt object to his forehead. The knife in his back matched those in a set found in a drawer in the kitchen. The apartment was "a shambles," with items turned over, drawers opened, and contents strewn about.

Forensic examination of blood samples at the scene identified two samples where the blood types and groupings were consistent with a combination of Levesque's blood and Joseph

Netto's blood.[5] A bloody footprint on a piece of floor tile matched Joseph's right footprint. A fingerprint on the handle of the bathroom door matched Nancy Netto's right thumb. That thumbprint was determined to be "fairly fresh," based on the speed with which it reacted to the application of chemicals and on the fact that the print had been left in a location that would, in the ordinary course, be subjected to frequent handling.

The police obtained arrest warrants for the Nettos and a warrant to search their apartment. That search uncovered eighteen dollars under a television set in the bedroom and clothes soaking in the bathroom tub and sink. There was no sign that the apartment had been or was in the process of being painted.

Later that night, police found and arrested the Nettos in their room at the motel. Among the items in their possession at the time of their arrest were jewelry, an ashtray, a toaster, and keys, which were later identified as belonging to Levesque. They also had cash, including ten one hundred dollar bills, three of which had spots of blood on them.[6] Examination of Joseph Netto's hand revealed a fresh cut between his thumb and forefinger.[7]

Counsel for Joseph Netto presented evidence that Costanzo had spent considerable amounts of money in the days immediately following the murder, and that he had not obtained such a sum of money from work. Counsel also presented evidence of a telephone call made to his office by Bennie White two months prior to the trial, during which White suggested that he knew more about the murder than he had told the police (or the jury). Counsel for both defendants suggested in closing argument that the crime had been perpetrated by either Costanzo or White.

2. *Motion to suppress.* Joseph Netto moved to suppress all evidence seized from the motel room.[8] After an evidentiary hearing, the motion judge allowed the motion to suppress. The

---

[5]There was no DNA analysis performed on any of the samples.

[6]The Nettos moved to suppress all of the evidence seized from their motel room. Details of those seizures are discussed below in connection with our analysis of the motion to suppress.

[7]The Commonwealth's theory was that the murder weapon had become slippery with blood, causing Joseph Netto's hand to slide down and be cut against the blade.

[8]Nancy Netto later filed an essentially identical motion.

Commonwealth's application for interlocutory review was allowed, and the appeal was heard by the Appeals Court. In an unpublished memorandum and order, the Appeals Court reversed, 39 Mass. App. Ct. 1123 (1996), and the defendant's application for further appellate review was denied. 422 Mass. 1104 (1996). As a result, various items seized from the motel room were introduced at trial. Notwithstanding the prior appeal and the denial of the application for further appellate review, both defendants are now entitled under G. L. c. 278, § 33E, to have this court review their contention that the motion to suppress should have been allowed.

The motion judge's findings, amplified by undisputed testimony at the evidentiary hearing, are as follows. Pursuant to arrest warrants, the police arrested the Nettos in their motel room at approximately 10 p.m. on November 20, the day after the murder. Officers telephoned the Nettos in their motel room, telling them that the police were there to arrest them. The police then knocked on the door, and Joseph Netto let them in. Joseph Netto was arrested and handcuffed immediately inside the doorway in a narrow hall next to the bathroom. Nancy Netto was arrested and handcuffed next to the bed. The police looked around the room, ascertaining that no one else was there. They observed clothes lying on a chair in the corner,[9] a pocketbook on the dresser, and a zippered leather bag in a wastepaper basket next to the dresser. The defendants were escorted out of the room, and the police seized the clothing, pocketbook, and leather bag. After booking the Nettos at the station, police examined the items they had seized from the motel room. Inside the leather bag, the police found rings and necklaces (later identified as Levesque's), along with ten one hundred dollar bills, including several that appeared to be bloodstained. Inside the pocketbook were keys belonging to Levesque. In a pocket of a pair of jeans they found another eighty-four dollars in cash.

The day after the defendants' arrest, the manager of the motel contacted the police and advised that the motel wanted to clean the room and prepare it for new guests. The manager asked the

[9]The defendants were "not dressed" at the time the officers entered the room. The clothes lying on the chair were presumably the clothes that the defendants had been wearing earlier.

police to remove the items remaining in the room. Officers returned to the motel and retrieved from the motel room a plastic trash bag containing a toaster and an ashtray (later identified as Levesque's).[10]

a. *Search incident to arrest.* The motion judge held that the seizure of the items at the time of the defendants' arrest exceeded the permissible scope of a search incident to arrest because the seizure was effected after the defendants had already been handcuffed and taken out of the room. The sequence of events, undisputed at the hearing, was that the "search" of the room occurred, and the items were noticed, while the defendants were still present, but that the items were physically "seized" after the defendants were escorted out of the room. We agree with the Appeals Court that nothing in this sequence takes this search and seizure outside the permissible limits of a search incident to arrest.

The defendants argue that their being placed in handcuffs restricted the spatial limitations on any search incident to their arrest, and that the items taken from the room were no longer within their reach at the precise moment the items were seized. The scope of a search incident to arrest is not as narrowly confined as the defendants suggest. In *Commonwealth* v. *Elizondo,* 428 Mass. 322, 324-325 (1998), this court upheld a search of a bathroom as a search incident to arrest, even though the defendant was arrested and already handcuffed "four or five feet" outside the bathroom. Obviously, the interior of the bathroom itself was beyond the immediate reach of the handcuffed defendant at the exact time of the search, but the defendant had obtained drugs from within the bathroom during a controlled buy immediately prior to his arrest. *Id.* at 323, 324. The court noted that "a police officer's decision how and where to conduct the search is 'a quick ad hoc judgment,' " and that "[a] search incident to arrest 'may be valid even though a court operating with the benefit of hindsight in an environment well removed from the scene of the arrest doubts that the defendant

---

[10]Officers had seen the trash bag at the time of the arrest the day before, but, at that time, they had no information concerning any missing toaster or ashtray and had therefore not recognized the items in that bag as having any evidentiary value.

could have reached the items seized during the search.' " *Id.* at 324, quoting *United States* v. *Queen,* 847 F.2d 346, 352 (7th Cir. 1988), and *United States* v. *Lucas,* 898 F.2d 606, 609 (8th Cir.), cert. denied, 498 U.S. 838 (1990).

Here, the police were dealing with two murder suspects in the close confines of a small motel room. They had probable cause to believe that the suspects still had with them the fruits of their robbery and murder.[11] As in *Commonwealth* v. *Elizondo, supra,* it is inappropriate to suppress evidence based on hindsight measurements of precisely how far each defendant could have reached at the moment the item in question was seized. See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 786-787, 791-792 (1977), overruled on other grounds, *Commonwealth* v. *Paulding, ante* 1 (2002) (upholding seizure and search of bag found at foot of defendant's hospital bed as search incident to arrest even though defendant was suffering from multiple gunshot wounds and outnumbered by two officers); *Commonwealth* v. *Turner,* 14 Mass. App. Ct. 1023, 1024 (1982) (search of pillowcase and tote bag placed on floor outside hotel room at time of arrest upheld as search incident to arrest even though defendants taken inside adjacent room prior to actual search). "While the need for the incident-to-arrest exception is indeed grounded on the need to protect law enforcement officers and evidence, the validity of such a search does not end at the instant the risks justifying the search come to an end. Even though the warrant exception is well grounded on the existence of exigent risks attending arrest, the pragmatic necessity of not invalidating such a search the instant the risks pass is well accepted. . . . [Officers] need not reorder the sequence of their conduct during arrest simply to satisfy an artificial rule that would link the validity of the search to the duration of the risks." *United States* v. *Nelson,* 102 F.3d 1344, 1347 (4th Cir. 1996), cert. denied, 520 U.S. 1203 (1997) (upholding search of shoulder bag as search incident to arrest, even though bag was searched after defendant was arrested and removed to another

---

[11]The search of the defendants' apartment earlier that day had not uncovered any jewelry or any substantial amount of money. It would be logical to assume that the defendants, on leaving their apartment, had taken with them any stolen monies or stolen personal items still in their possession.

room). Here, the defendants acknowledge that the officers could have seized the items at the time they first entered the room. That the officers handcuffed the defendants and removed them from the room (for obvious purposes of officer safety) should not preclude them from seizing those same items immediately following the removal of the defendants.

Indeed, in *Commonwealth* v. *Madera*, 402 Mass. 156, 160-161 (1988), this court upheld the search of a gym bag taken from the defendant at the time of his arrest even though "the police presence was substantial and the risk of the defendant successfully repossessing the bag was minimal." There, as here, the object of the search was evidence relating to the same crime for which the defendant had been arrested. Rather than "rely-[ing] on the existence of a tenuous or perhaps even imaginary exigency to uphold the search," the court held that "[t]he police are entitled to a bright line rule that permits them, even in the absence of exigent circumstances, to search a bag carried by a person whom they lawfully arrest on probable cause, or otherwise, where there is also probable cause to believe that the bag contains evidence of the crime for which the arrest was made." *Id.* See *Commonwealth* v. *Clermy*, 421 Mass. 325, 329-331 (1995). That is precisely what happened here. The police seized and searched the immediate personal possessions (bag, pocketbook, and clothing) of two suspects arrested pursuant to a warrant, where those possessions were near at hand in the room where the arrests occurred, and where the police had probable cause to believe that those items contained evidence of the crimes for which the defendants were being arrested.[12] The Appeals Court correctly recognized that the search was valid under the principles articulated in *Commonwealth* v. *Madera, supra.*[13]

b. *Search of the motel room the day following the arrest.* The

---

·    [12]A defendant's clothing is often seized incident to an arrest. See *Commonwealth* v. *Robles*, 423 Mass. 62, 67-68 (1996), and cases cited. Here, the defendants were undressed, and the clothing they apparently had been wearing was lying on a chair. For purposes of the crimes at issue, clothing could logically be thought to contain proceeds of the robbery (cash or jewelry), or to be of value for forensic investigation. Similarly, given that the principal item taken during the robbery was believed to be cash, it was logical for the police to believe that the cash would be carried in a pocketbook or bag.

[13]The defendants also contend that, because any exigency at the scene had passed by the time the officers returned to the police station, the further search

toaster and ashtray were not seized until the day after the defendants' arrest, and that seizure therefore cannot be justified as a search incident to arrest. By that time, however, the defendants no longer had a reasonable expectation of privacy with respect to items left in the motel room. A guest does not have any expectation of privacy in his hotel room once his rental period has expired. See *Commonwealth* v. *Paszko*, 391 Mass. 164, 185 (1984), quoting *United States* v. *Jackson*, 585 F.2d 653, 658 (4th Cir. 1978); *Commonwealth* v. *Brass*, 42 Mass. App. Ct. 88, 89-90 (1997), and cases cited.

The defendants argue, however, that there was no evidence of the precise checkout time at the motel, and thus no evidence as to whether the police entry into the room that day was before or after the defendants' rental period for the room had expired. Of course, the burden is initially on the defendants to demonstrate that they had a reasonable expectation of privacy in the motel room and its contents at the time of the search. See *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991), citing *Commonwealth* v. *Mamacos*, 409 Mass. 635, 638 (1991). It is not the Commonwealth's burden to show that there was no such reasonable expectation of privacy at that time. Thus, if the record is unclear as to whether the room was still rented to the defendants at the time of the search, it is the defendants — not the Commonwealth — who have failed to meet their burden of proof, as they are the ones who must show that a "search" in the constitutional sense occurred. See *Commonwealth* v. *Pina*, 406 Mass. 540, 544, cert. denied, 498 U.S. 832 (1990); *Commonwealth* v. *Glowacki*, 398 Mass. 507, 512 (1986); *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 714-715 (1986). See also *Commonwealth* v. *Brass*, *supra* at 91-92.

---

of the seized items could not be performed at the station. Again, *Commonwealth* v. *Madera*, 402 Mass. 156, 160-161 (1988), makes clear that this search did not have to be justified by any "exigency." We also note that the police here had obtained both arrest warrants for the defendants and a search warrant for the defendants' apartment (which authorized them to search "any person present"). When it turned out that the defendants had fled their apartment for the motel, requiring police to obtain yet another warrant to search the items in the defendants' possession at the motel — the precise sorts of items already identified in the earlier search warrant — "would afford insignificant protection to a defendant and would unnecessarily burden the criminal justice system." *Id.* at 160.

Moreover, even if the motel manager let the police into the room slightly prior to the customary checkout time, a hotel guest relinquishes any expectation of privacy during the remainder of the rental period once the guest abandons the room. See *Commonwealth* v. *Paszko, supra* at 184-185 (where guest departed motel room two days prior to end of rental period, registered at another motel, and was traveling to another city, he had no intent to return prior to checkout time and was found to have abandoned room). Where circumstances make it apparent to hotel personnel that a guest has left and will not be returning prior to the checkout time deadline, that guest has no reasonable expectation of privacy in the formerly occupied room, as it is to be expected that hotel staff will enter the room, remove any belongings left behind, and rent the room to the next guest. This is true without regard to the circumstances that caused the guest to depart, as long as it is clear that the guest is not returning. Thus, the fact that a guest's premature departure from the hotel was involuntary does not operate to extend the period of the guest's expectation of privacy in the room. Rather, it is the fact of abandonment, not the circumstances that gave rise to the abandonment, that causes the previously reasonable expectation of privacy to end. Here, the guests' abandonment of the room was due to their arrest on murder charges. As of the next day, when the rental was to expire, they had not returned to retrieve their belongings, made any arrangements to have someone else retrieve their belongings, or taken any steps to extend the rental period. From the motel's point of view, the room had been abandoned. In such circumstances, they no longer had any reasonable expectation of privacy in the room, as it would not have been reasonable for them to expect that motel personnel would not disturb the room or the belongings they had left behind. See *United States* v. *Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992) (no expectation of privacy in motel room after initial rental period expired, rejecting argument that expectation should be extended because arrest prior to termination of rental period had prevented guest from extending rental); *United States* v. *Croft*, 429 F.2d 884, 887 (10th Cir. 1970) (same); *United States* v. *Reyes*, 908 F.2d 281, 285-286 (8th Cir. 1990), cert. denied, 499 U.S. 908 (1991) (no continued expecta-

tion of privacy where arrest prevented defendant from extending his rental of locker). See also *Abel* v. *United States*, 362 U.S. 217, 223-224, 241 (1960) (defendant who checked out of hotel after being arrested in his room had no remaining expectation of privacy in room). Lacking any reasonable expectation of privacy, the defendants have failed to establish that there was any "search" of the room in the constitutional sense when motel personnel called the police and asked them to retrieve the defendants' belongings from the room.

3. *Voluntariness of Joseph Netto's statement to White.* Joseph Netto claims that the judge erred in not conducting a voir dire to determine the voluntariness of his statement to Bennie White, in which the defendant predicted that Levesque would "end up with a knife in his back." At trial, the defendant never raised any objection on grounds of alleged involuntariness, and never requested a voir dire on the issue.[14] His theory at trial was that the statement was never made. His counsel impeached White by demonstrating that White had never told the police of this alleged statement (despite its obvious relevance to the investigation), and argued that White's eve of trial invention of such a statement was the product of White's efforts to shift blame to the defendant.

The contention, now raised on appeal, that the statement should have been excluded for lack of voluntariness is premised on the fallacious assumption that voluntariness is even germane to statements made prior to the crime. See *Commonwealth* v. *Boateng, ante* 498, 504 (2003). Here, we are not dealing with any form of admission or confession to a crime that has been obtained in circumstances giving rise to a question whether it was given involuntarily. Rather, we are dealing with a defendant's expression of his state of mind, made prior to the crime, concerning his dislike of the victim. Here, as in *Commonwealth* v. *Boateng, supra,* the defendant cites no authority for the proposition that such precrime statements are only admis-

---

[14]There was only a general objection to White's testimony, without any subsequent indication of the basis for the objection. Then, when White testified that the defendant was under the influence of heroin at the time of the statement (the ground asserted for the present claim of lack of voluntariness), the defendant objected that the testimony was "not responsive" to the question. Neither of these objections raised an issue of lack of voluntariness.

sible if they meet the test of voluntariness that we apply to a defendant's postcrime admission or confession. See Fifth Amendment to the United States Constitution; art. 12 of the Declaration of Rights of the Massachusetts Constitution.

4. *Sufficiency of the evidence of joint venture.* Joseph Netto argues that there was insufficient evidence to submit his indictment to the jury on the alternative theory of joint venture,[15] because the Commonwealth failed to introduce sufficient evidence that Nancy Netto was the actual stabber. Although the defendant moved for a required finding of not guilty, his motion did not specify the defect in the evidence that he now raises on appeal. "[A] *generally phrased* motion for directed verdict does not preserve for review the denial of the motion on a specific theory of liability when there was sufficient evidence to withstand the motion on an alternative theory" (emphasis in original). *Commonwealth* v. *Berry,* 431 Mass. 326, 331 (2000). Under G. L. c. 278, § 33E, we therefore review whether submission of the indictment to the jury on theories of both principal and joint venture liability gives rise to a substantial likelihood of a miscarriage of justice. We conclude that there was sufficient evidence to submit the case to the jury on both theories.[16]

The defendant's argument is based on a misperception as to the elements of joint venture. To succeed on a joint venture theory, the Commonwealth need not prove the identity of the

---

[15]He acknowledges that there was sufficient evidence to convict him as the principal.

[16]Even if the evidence of joint venture were insufficient, the submission of that theory to the jury does not give rise to a substantial likelihood of a miscarriage of justice. It is evident from the verdicts returned that the jury convicted Joseph Netto as the actual stabber. Joseph Netto was found guilty of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, whereas Nancy Netto was convicted only on the basis of felony-murder. Moreover, during their deliberations, the jury asked a question expressing doubt whether Nancy Netto was even present during the actual stabbing, and asking whether her presence at and participation in the robbery would suffice for a conviction of joint venture felony-murder even if she had not been physically present at the time of the killing itself. See note 19, *infra.* From the combination of verdicts returned, and from the question posed by the jury, it is apparent that Joseph Netto was convicted as a principal, not as a joint venturer. See *Commonwealth* v. *Randolph, ante* 290, 300-301 (2002) (analysis of combination of verdicts returned by jury logically established that jury rejected certain evidence).

actual perpetrator and need not prove that someone other than the defendant was the actual perpetrator. See *Commonwealth* v. *Souza*, 428 Mass. 478, 488-489 (1998); *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994). Rather, liability as a joint venturer only requires proof that the defendant was present at the scene of the crime, that he had knowledge that another intended to commit the crime and shared the intent to commit the crime, and that, by agreement, he was willing and available to help the other if necessary. *Commonwealth* v. *Souza, supra* at 488, quoting *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996). As here, the Commonwealth may present strong but circumstantial evidence that the defendant himself was the principal perpetrator while simultaneously presenting evidence that the crime was committed as part of a joint venture. Where a joint venture has been shown, the strength of the Commonwealth's evidence proving that the defendant was the principal perpetrator does not prevent the submission of the alternative theory of joint venture, and it would be anomalous to deprive the Commonwealth of that alternative theory merely because it also had a well-supported theory of principal liability. While the circumstantial evidence may strongly suggest which of the joint venturers was the principal perpetrator, the jury may not be convinced of the defendant's principal liability beyond a reasonable doubt. If the jury have such doubt, they may still convict if they are convinced beyond a reasonable doubt that the elements of joint venture were proved. Here, there was ample evidence that the defendants were joint venturers in the robbery and murder of Levesque, with circumstantial evidence pointing to Joseph Netto as the actual stabber. That the Commonwealth did not present evidence identifying the coventurer, Nancy Netto, as the stabber did not preclude the Commonwealth from pursuing a theory of joint venture liability as to Joseph Netto.

5. *Sufficiency of the evidence as to Nancy Netto.* Nancy Netto argues that there was insufficient evidence of her presence, knowledge of a weapon, or participation in the crime to warrant a conviction of felony-murder as a joint venturer predicated on armed robbery. We disagree. As to her presence at the scene, the Commonwealth introduced evidence that her fingerprint was

on the bathroom door handle in Levesque's apartment, that it was a "fairly fresh" print, and that Nancy Netto had not been allowed into the apartment for one week prior to the crime. In combination, that evidence, viewed in the light most favorable to the Commonwealth, was sufficient to prove that Nancy Netto had been in Levesque's apartment at the time of the crime. See *Commonwealth* v. *Clark*, 378 Mass. 392, 405-406 (1979), quoting *McNeil* v. *State*, 227 Md. 298, 300 (1961) ("fingerprint evidence found at the scene of a crime must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime"); *Commonwealth* v. *LaCorte*, 373 Mass. 700, 703 (1977) ("when the prosecution can establish that fingerprints found at the scene of the crime could have been impressed only during the commission of the crime, fingerprint evidence pointing to the defendant almost certainly will support a conviction").[17] There was sufficient evidence of Nancy Netto's physical presence in Levesque's apartment on the night of the robbery and murder.

The defendant also argues that there was insufficient evidence of her knowledge that her coventurer was armed with a dangerous weapon, thus precluding any conviction of armed robbery or felony-murder predicated on armed robbery. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988). We conclude that the evidence was sufficient to permit the inference of such knowledge. Knowledge that a fellow joint venturer is armed may be inferred when, from the circumstances of the crime, a victim's resistance is reasonably to be anticipated such that the

---

[17]While the fingerprint may have been the strongest evidence of Nancy Netto's physical presence at the scene, there was abundant other evidence linking her to this crime. She made immediate use of the proceeds of the crime, calling Costanzo for a ride (for the purpose of getting heroin that she had been unable to afford earlier in the day) at around 6 P.M., a mere one-half hour (or less) after Levesque was last seen alive. She was the one who "stashed" the money taken from Levesque, and she protested that the food items purchased with that money were "her" groceries. She "went out of her mind" when she thought that Joseph had told Bennie White about the crime later that same night, and she gave motel personnel the false story about leaving her home because of "paint fumes." Levesque's keys were found in her pocketbook. This is not a case where "fingerprints constitute the only identification evidence" linking the defendant to the crime. *Commonwealth* v. *LaCorte*, 373 Mass. 700, 703 (1977).

participants in the crime would have recognized the need for some means by which to overcome that resistance. See *Commonwealth* v. *Watson*, 388 Mass. 536, 546-547 n.9 (1983), *S.C.*, 393 Mass. 297 (1984); *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974); *Commonwealth* v. *Colon*, 52 Mass. App. Ct. 725, 728 (2001); *Commonwealth* v. *Tracy*, 27 Mass. App. Ct. 455, 457-458 (1989). Here, it was readily foreseeable that the robbery of Levesque, which was to occur in his own home after he had told Nancy Netto that she was no longer welcome there, would require some means of subduing him. And, where the robbers intended to go through Levesque's apartment looking for various items to steal, Levesque would need to be subdued for some period of time, not just temporarily distracted or held at bay while a single item was snatched. The defendants could not expect to incapacitate Levesque for that length of time merely by outnumbering him — the evidence was that Nancy Netto was extremely skinny, frail, and sickly at the time. Moreover, the coventurers had ample opportunity to plan the robbery together, as they lived together in the same household. See *Commonwealth* v. *Tracy*, *supra* at 458 (fact that joint venturers were "long-time friends and had spent the afternoon together prior to the robbery" supported inference that both had known about planned use of gun). These factors, in combination, made it reasonable to infer that the plan for the robbery included a plan with respect to the use of some form of weapon and that Nancy Netto would have been aware of that planned weapon.

The defendant argues that, because the murder weapon came from inside Levesque's apartment and was not brought to the scene by her joint venturer, the use of the weapon could have been totally unplanned and unforeseen, and she would not have had any opportunity to observe her coventurer carrying the weapon. That argument, although it might persuade a jury not to draw any inference of the defendant's knowledge of the weapon, does not prevent the jury from drawing that inference. Inferences must be reasonable, but they do not have to be inescapable. The mere existence of some argument against the inference does not make the inference impermissible.

Moreover, her argument ignores other evidence suggesting that Levesque was also struck in the head with a blunt object.

From the combination of wounds and the location of the body, it would appear that Levesque was struck with some object just inside the door and, when that blow proved inadequate to subdue him,[18] one of the defendants obtained a more lethal weapon from the kitchen. Joseph Netto then used that weapon to kill Levesque. On this evidence, it was permissible for the jury to infer that Nancy Netto had knowledge that her coventurer in the robbery was armed.

6. *Lesser included offense of unarmed robbery.* Nancy Netto argues on appeal that the judge erred in not instructing the jury on the lesser included offense of unarmed robbery and not instructing the jury on felony-murder predicated on an unarmed robbery. At trial, counsel made no request with respect to any lesser included offenses. The judge expressly noted the absence of any such requests, and recognized that there were valid strategic reasons for not requesting lesser included offenses on the verdict slips. Having waived this issue below, Nancy Netto now contends that failure to instruct on unarmed robbery, and on felony-murder predicated on unarmed robbery, creates a substantial likelihood of a miscarriage of justice such that we should reverse the conviction pursuant to G. L. c. 278, § 33E.

We agree that, had they been requested, instructions on the lesser included offense of unarmed robbery, and corresponding instructions on felony-murder predicated on unarmed robbery, would have been required. While, as discussed above, the evidence permitted the jury to infer that Nancy Netto had the requisite knowledge that her coventurer was armed, the jury were not compelled to draw such an inference. It was thus permissible for the jury to conclude that Nancy Netto had been a joint venturer in a robbery but, if unconvinced that she knew about the weapon, she only had the requisite knowledge and intent to participate in an unarmed robbery. And, while unarmed robbery is a felony, it is not within the category of crimes that are inherently dangerous to human life. *Commonwealth* v. *Moran*, 387 Mass. 644, 651 (1982). Cf. *Commonwealth* v. *Sim-*

---

[18]The downstairs neighbor heard raised men's voices coming from Levesque's apartment shortly after the time Levesque would have returned home. This suggests that Levesque did indeed put up some degree of resistance once he realized the Nettos' plans.

*mons*, 417 Mass. 60, 70-71 (1994), citing *Commonwealth* v. *Watson, supra* at 544 (armed robbery inherently involves conscious disregard of risk to human life). Therefore, unarmed robbery may operate as the predicate felony for felony-murder in the first degree only "if the jury find from the circumstances of the felony that the defendant consciously disregarded risk to human life." *Commonwealth* v. *Moran, supra.* See *Commonwealth* v. *Jackson*, 432 Mass. 82, 90 (2000).

That instruction on these points would have been appropriate if requested does not mean that failure so to instruct necessarily gives rise to a substantial likelihood of a miscarriage of justice. We have previously noted that there are sound tactical reasons for a defendant to decline an instruction on unarmed robbery as the predicate for felony-murder, as such an instruction merely gives the jury an alternative basis on which to convict the defendant of felony-murder. See *Commonwealth* v. *Melendez*, 427 Mass. 214, 219-220 (1998). Here, there was abundant evidence on which the jury could have concluded that this particular robbery, even assuming that it was initially undertaken by Nancy Netto in the belief that it was an unarmed robbery, was committed with a conscious disregard of the risk to human life. The robbery took place in the victim's home, a factor which decreases the victim's ability to escape, increases the likelihood and degree of resistance, and thereby increases the probability that the victim (or someone coming to aid the victim) will be killed. See *Commonwealth* v. *Jackson, supra* at 89-90 (assaultive burglary, even if unarmed, is felony inherently dangerous to human life because of perils associated with assaults committed by intruder into home). Here, the defendants knew they were unwelcome in Levesque's home, and, even if unarmed, must have intended to use force to subdue him and to keep him incapacitated while they ransacked the apartment. And, as Levesque evidently resisted the intrusion and the robbery, the initially unarmed robbery (assuming it was such) rapidly escalated to an extremely violent attack. Had the jury been instructed on the requirements for felony-murder predicated on unarmed robbery, the Commonwealth had readily met its burden of proving the additional requirement of a conscious disregard of the risk to human life in the circumstances of this particular robbery.

Rather, as indicated in *Commonwealth* v. *Melendez, supra*, it is potentially beneficial to the defendant to forgo any instruction on unarmed robbery and, in the hope of obtaining an acquittal, capitalize on the weaknesses in the Commonwealth's evidence concerning knowledge of a weapon. That is precisely the argument that defense counsel made below. His closing argument highlighted the various ways in which the Commonwealth's evidence of Nancy Netto's involvement in the actual crime was missing, e.g., the lack of any blood samples linked to her, the lack of any injuries on her (as opposed to her codefendant's cut hand), and the uncertainty as to when the allegedly inculpatory fingerprint might have been placed on the bathroom door handle.[19] In the same vein, his closing argument stressed the

[19]These arguments were sufficiently persuasive to cause the jury to ask for further instructions concerning the timing of Nancy Netto's physical presence in Levesque's apartment. In response to the jury's question whether joint venture felony-murder required the defendant to be physically present at the time of the actual stabbing (see note 16, *supra*), the judge provided a thorough and complete explanation of the requirement that the killing had to be "incidental to and the natural and probable consequence of the armed robbery," see *Commonwealth* v. *Nichypor*, 419 Mass. 209, 215 (1994), specifically advising the jury that "[i]n order for the killing to be incidental to and a natural and probable consequence of the nonstabber's participation in the armed robbery, the killing must have taken place during a single logically related continuing criminal transaction at a time when the nonstabber was actively involved as a participant in the armed robbery." He then articulated further that, if a joint venturer in an armed robbery "was no longer actively involved and the killing took place after the nonstabber was no longer actively involved in committing a crime, then the nonstabber is not guilty of armed robbery felony murder." He also instructed the jury that if the joint venturer did not become involved until after the victim had already been killed, the joint venturer would not be guilty of armed robbery or of any form of murder. In considering these issues, the judge instructed the jury to consider several factors: whether there was "a break in the logical chain of events" between the robbery in which the joint venturer was involved and the killing, whether there was "a separation of an appreciable amount of time" between the robbery and the killing, and whether the killing "occurr[ed] at a place that was different and separate from the nonstabber." Counsel for both defendants stated that they were satisfied with these supplemental instructions; neither defendant raises any claim of error with respect to these supplemental instructions; and, reviewing them under G. L. c. 278, § 33E, we are satisfied that these supplemental instructions provided the jury with correct guidance in response to their question. As such, the jury's doubt as to whether Nancy Netto was physically present during the actual stabbing did not prevent the jury from finding her guilty of felony-murder, as, having been instructed on

lack of evidence with regard to Nancy Netto's awareness of any weapon, providing a further example of the weaknesses in the case against Nancy Netto. It would not have aided the defense to have the judge tell the jury that what was being argued to them as a fatal weakness in the Commonwealth's evidence was not in fact an impediment to the jury's finding her guilty of felony-murder in the first degree. Counsel's concurrence in the judge's statement that there were strategic reasons for not wanting an instruction on unarmed robbery was reasonable and appropriate.[20] Where counsel's failure to request such an instruction, or to make any objection to the instructions on this issue, was a reasonable tactical decision, we do not find a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Randolph, ante* 290, 298 (2002) (in order to find substantial risk of a miscarriage of justice, court must find that "counsel's failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision").

7. *Conclusion.* We therefore vacate as duplicative the armed robbery conviction as to Nancy Netto (see note 2, *supra*), affirm the remaining convictions as to both defendants, and decline to grant relief pursuant to G. L. c. 278, § 33E.

*So ordered.*

---

the ramifications of that aspect of the facts, they concluded that the killing of Levesque occurred incidental to and as a natural and probable consequence of her involvement in the armed robbery.

[20]Appellate counsel misinterprets the transcript to suggest that counsel failed to see that there were any lesser included offenses that would have been supported by the evidence. Trial counsel accurately noted that, as to Nancy Netto, there was no basis for a verdict of murder in the second degree. Unarmed robbery can form the predicate for felony-murder in the first degree, as long as the Commonwealth proves the requisite conscious disregard of the risk to human life. *Commonwealth* v. *Jackson,* 432 Mass. 82, 90 (2000). *Commonwealth* v. *Moran,* 387 Mass. 644, 651 (1982). Unarmed robbery does not reduce the crime to felony-murder in the second degree. Nowhere does the transcript suggest that counsel was unaware of the possibility that the evidence could support a charge of unarmed robbery.