## COMMONWEALTH vs. DAMON J. CANNON.

Plymouth. January 5, 2007. - July 17, 2007.

Present: MARSHALL, C.J., IRELAND, SPINA, & COWIN, JJ.

*Homicide. Joint Enterprise. Robbery. Felony-Murder Rule. Practice, Criminal,*
Instructions to jury, Severance, Argument by prosecutor, Assistance of
counsel, Capital case, Grand jury proceedings. *Grand Jury. Constitutional
Law,* Confrontation of witnesses, Assistance of counsel. *Evidence,* Bias,
Cumulative evidence, Cross-examination, Prior misconduct.

The evidence at a criminal trial was insufficient to convict the defendant of
murder in the first degree as a principal, where it was equally likely that
another person was the one who shot the victim [467-468], but there was
sufficient evidence to convict the defendant of attempted armed robbery as
a joint venturer, in that the defendant was at the scene of the crime, with
knowledge that another intended to commit the crime and with a shared
intent to commit the crime, and in that the defendant aided or assisted in
the commission of the crime [468-471], and therefore, the evidence was
sufficient to convict the defendant of murder in the first degree on a theory
of felony-murder [471]; however, because the jury verdict did not specify
whether the conviction of murder in the first degree was premised on a
theory of principal or joint venture liability, this court reversed the convic-
tion, set aside the verdict, and remanded the matter for a new trial on a
theory of joint venture only [475].

At a criminal trial, the judge did not err in supplementing her instruction to
the jury on joint venture, where she reminded them that the burden was on
the Commonwealth to prove every element of the crime, and directed them
to the relevant portions of her instructions. [471-472]

Discussion of issues regarding severance [472-473], the need to instruct the
jury regarding promises or inducements to a witness [473-474], and the
use of grand jury testimony in evidence [474-475] in a criminal matter in
which the defendant was to have a new trial.

INDICTMENT found and returned in the Superior Court Depart-
ment on June 27, 2001.

The case was tried before *Linda E. Giles,* J.

*Greg T. Schubert* for the defendant.

*Julia K. Holler,* Special Assistant District Attorney, for the
Commonwealth.

MARSHALL, C.J. In the early hours of April 19, 2001, the victim,
a dealer in illegal drugs, was shot to death in his apartment dur-
ing an incident involving the defendant and two other men.

The defendant was indicted for murder in the first degree, armed robbery,[1] attempted armed robbery, and unlawful possession of a sawed-off shotgun unconnected to the shooting.

At trial the Commonwealth sought to prove the murder charge based on theories of extreme atrocity or cruelty and felony-murder (the armed robbery or attempted armed robbery constituting the underlying felony), proceeding against the defendant on both principal and joint venture liability. The defendant pursued an alibi defense. The jury convicted the defendant of murder in the first degree based on both felony-murder (attempted armed robbery) and extreme atrocity or cruelty.[2] The jury did not specify whether they did so based on principal or joint venture liability.

On appeal the defendant claims that the Commonwealth's evidence was insufficient to prove murder in the first degree under the doctrine of felony-murder, whether on a theory of principal or joint venture liability.[3] Specifically, he argues that the Commonwealth failed to prove that he shared an intent with his cohorts to rob the victim or that he knew that one of his cohorts was armed.

We conclude that the evidence was sufficient to warrant a finding of murder in the first degree based on the defendant's joint venture participation in an attempted armed robbery, but was insufficient to prove his guilt under the theory of extreme atrocity or cruelty on that basis. We also conclude that the evidence of principal liability (under either theory) was insufficient. We therefore reverse the defendant's conviction of murder in the first degree because we cannot know whether any juror based the verdict on a legally unsupported theory. See *Commonwealth* v. *Plunkett*, 422 Mass. 634, 635 (1996).

1. *Facts.* We summarize the evidence at trial in its light most favorable to the Commonwealth, *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985), reserving certain details for discussion in connection with the issues raised.

---

[1]No items were taken from the apartment. At the close of the Commonwealth's case, the judge allowed the defendant's motion for a required finding of not guilty with regard to the indictment charging armed robbery.

[2]The jury additionally convicted the defendant of attempted armed robbery, and acquitted the defendant of unlawful possession of a sawed-off shotgun.

[3]The defendant brings other claims of error, which we discuss *infra*.

The victim sold marijuana from his third-floor apartment, where he lived with his girl friend, Kerry Murphy. The defendant was a regular customer of the victim and was known to Murphy.[4] There was no remote entry buzzer at the front door of the building where the victim and Murphy lived and therefore no remote access by which to admit customers or other visitors. A resident had to open the front door to the building personally when summoned by a visitor. The victim's practice when hearing the doorbell was to look down from the balcony of his apartment to identify the visitor, and then either throw the front door keys down to the visitor waiting at the building entrance, or go downstairs himself to open the door.

At approximately midnight on the night of the killing, two witnesses who were seated in an automobile outside the apartment building saw a reddish Toyota Camry automobile arrive and park in front of the building. Three men emerged from the automobile, their heads covered by hats or hoods. Two of the men immediately entered the building (the front door to the building was likely propped open with a piece of wood as, Murphy testified, it was from time to time) and proceeded up the stairs while the third man, "staying by the bell," appeared to ring the bell. He then joined the others inside.

In the apartment, Murphy was awakened in her bedroom by the sound of men's voices in the living room.[5] She testified that she heard the voices of "more than one" person, other than the victim. She identified one voice as that of the defendant, asking to buy drugs: "I don't know. An ounce." She then heard someone else — she did not recognize the voice — say, "Run him. Run him." Murphy testified that she understood the phrase to mean "rob him."[6]

Immediately thereafter, Murphy testified, she heard three to

---

[4]There was evidence that Murphy knew most of the victim's customers, including the defendant. She had seen the defendant in the apartment seven to eight times before the night in question, had heard his voice several times, and had spoken to him on two occasions.

[5]When questioned at the Brockton police station on the morning of the shooting, Murphy said that she had been awakened by the sound of gunshots.

[6]Murphy's interpretation of the phrase was corroborated by Detective Ernest Bell of the Brockton police department.

four gunshots.[7] She ran down the hall toward the living room and caught sight of an African-American man wearing dark-colored clothes "duck[ing]" as he ran out the apartment's front door. She saw the defendant standing in the living room looking "surprised and scared." Murphy testified that she and the defendant stared at each other, eye to eye, for approximately fifteen seconds before the defendant fled, trying to shut the apartment door behind him. She did not see the defendant's hands or whether he was holding a gun. The victim was lying bleeding on the floor with his own gun lying next to him.[8] He had been shot in the right wrist and twice in the neck.[9]

The two witnesses in the automobile outside the building heard shots from inside. A resident on the third floor of the apartment building awoke to the sound of gunshots and heard different voices saying, "Let's go," three times, followed by the sound of people (he could not say how many) running down the stairs.[10] He heard an automobile "screeching" away approximately forty seconds later.[11] A resident in a nearby building, with windows facing the victim's apartment building, testified that she heard three shots and then saw three men get into a burgundy-colored automobile and "fly" away without turning on the headlights.

Murphy telephoned 911 and then concealed the victim's gun. When asked by the 911 operator who had done the shooting, Murphy replied that she did not know; she did not identify the

---

[7]A witness testified that the elapsed time between the men entering the building and the sound of gunshots was between two and five minutes.

[8]Murphy testified that the victim kept a .40 caliber gun in the living room, normally concealed in a cushion of the sofa. She knew that the victim's gun was not licensed. A ballistics expert testified that the victim's gun had not been fired that evening.

[9]Of the two gunshot wounds to the victim's neck, the medical examiner testified that one of the shots was discharged between two and eight inches from the victim's neck.

[10]The resident testified that he could not tell how many voices there were, but it "sounded like more than one." A second resident responded "Uh huh" and "Yup" to the following questions on direct and cross-examination: "And you hear[d] two people running down the stairs?" "And then you heard what sounded like two people almost crashing down the stairs, correct?"

[11]The witnesses in the automobile outside the building testified that they saw the same three men return to the automobile and "take off" "very fast" two to three minutes after the gunshots.

defendant.[12] She also initially told the police that she did not know the identity of the victim's assailants. Murphy later left the apartment with the police, taking with her the victim's wallet, which she initially did not show to the police.[13] She testified that at the time she was in a state of shock, and could not say why she had hidden the victim's gun or taken his wallet.

At trial Murphy testified that she originally had refrained from telling the police that the victim dealt in illegal drugs because she did not know that the victim had been killed, she "was scared that he would go to jail," and she was "scared for [her] life." After learning of the victim's death, Murphy told the police that the victim had been selling marijuana from the apartment. She also then told the police for the first time that she had heard the defendant's voice in the apartment shortly before the shooting, and had seen him in the apartment after the victim had been shot.

Police recovered four spent .38 caliber bullets, two from the apartment and two from the clothes and body of victim. A ballistics expert testified that three of the bullets were fired from the same .38 caliber weapon; the fourth bullet, recovered "lying on the rug" in the apartment, was consistent with having been fired by the same weapon.

The police discovered a trail of blood through the building and "smeared on the walls" in the stairwell. A deoxyribonucleic acid (DNA) test of the blood conducted one and one-half years after the shooting linked the blood to Corinthian "Calvin" Housen. Two cousins of the defendant identified Housen from a photographic array as someone with whom the defendant "hung around."[14]

The defendant was arrested the day after the shooting at the

---

[12]A recording of the 911 telephone call was introduced in evidence and played for the jury.

[13]The police did not take the wallet as evidence.

[14]Corinthian Housen and the defendant were charged with identical crimes. Housen was tried separately after a judge granted the defendant's motion to sever the two cases. Housen was convicted of murder in the first degree, and his appeal from his conviction is pending. The third individual who entered the building on the night in question was identified by Housen to the police. We are unaware of any criminal proceedings that may have been brought against that individual.

home of his cousin, who lived in an apartment building on the same street as the victim (approximately 150 yards away).[15] Police discovered the defendant hiding in the bedroom of his cousin's son and, during a search of that room, recovered a sawed-off shotgun from the closet. When arrested, the defendant was checked by the police but had no cuts, scratches, or other wounds.

2. *Required finding of not guilty.* The defendant claims that there was insufficient evidence for the jury to find beyond a reasonable doubt that he was the principal, i.e., the shooter, or that he was a joint venturer in an attempted armed robbery. We address each theory in turn, reviewing the defendant's claims under the familiar standard: "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

We consider first the sufficiency of the evidence to convict the defendant of murder in the first degree on a theory of principal liability. The Commonwealth argues that the jury could infer that the defendant fired the shots at the victim in an attempt to rob him at "Housen's exhortation to 'run him,' " pointing to evidence that the exhortation was followed almost immediately by gunshots; that (other than the victim) Housen, not the defendant, was injured; that Murphy saw only two people in the apartment; and that one neighbor in the building heard what sounded like two people "almost crashing" down the stairs.

We have carefully reviewed all of the evidence before the jury and conclude that the evidence, collectively, was insufficient for the jury to find beyond a reasonable doubt that the defendant was the shooter. Rather, it is just as likely that Housen or a third man was the shooter. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965) ("When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof").

First, there is no direct evidence that the defendant held or

---

[15]The cousin testified that the defendant was in her apartment when she went to bed at approximately 11:30 P.M., and was also there when she awoke between 3 and 3:30 A.M.

fired a gun. It is reasonable to infer that there was sufficient time for the third man to join the first two in the victim's apartment before the shooting occurred; several witnesses saw three men enter and then leave the building together. As to Housen's injuries, the jury could have inferred that someone other than the defendant caused them. The evidence allowed the jury to infer that a third man had fired the gun. Thus, the jury could have concluded that it was the coventurer who shot the victim, accidentally shooting Housen in the process. It is also possible that Housen was holding the gun and accidentally shot himself when the victim lunged at him. Here, as in *Commonwealth* v. *Salemme*, 395 Mass. 594, 599-600 (1985), "[n]o rational trier of fact . . . could conclude, beyond a reasonable doubt, . . . that [the defendant], rather than [another party present at the scene], fired the shot which killed [the victim]. . . . For the jury to find the facts according to the Commonwealth's theory [of principal liability], they inevitably had to engage in impermissible conjecture or surmise." The verdict of murder in the first degree on the theory of the defendant as principal cannot stand.[16]

We next consider whether there is sufficient evidence for the jury to have found beyond a reasonable doubt that the defendant was a joint venturer in an attempted armed robbery. The judge correctly instructed the jury that to find that the defendant was a joint venturer, they had to find beyond a reasonable doubt that the defendant was at the scene of the crime, with knowledge that another intended to commit the crime and with a shared intent to commit the crime, and that the defendant aided or assisted in the commission of the crime, or was willing and available to assist the other person in carrying out the crime if necessary. See *Commonwealth* v. *Souza*, 428 Mass. 478, 488 (1998) (discussion of elements required for joint venture). The judge also correctly instructed that the jury were permitted to

[16]The defendant does not challenge the sufficiency of the evidence supporting his conviction of murder based on extreme atrocity or cruelty, but we have an obligation to consider the point. G. L. c. 278, § 33E. If the evidence is insufficient for the jury to find beyond a reasonable doubt that the defendant was the shooter, the evidence is similarly insufficient for the jury to find beyond a reasonable doubt that he was the principal under a theory of extreme atrocity or cruelty.

infer the defendant's intent from his knowledge of the circumstances or subsequent participation in the crime. See *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

There was plainly sufficient evidence that the defendant was at the scene of the crime: Murphy's testimony that she heard and saw the defendant in the apartment was unequivocal. She recognized his voice when she was in the bedroom, and she recognized him when she saw him face-to-face in the living room.[17]

There was also sufficient evidence from which the jury could reasonably infer beyond a reasonable doubt that a robbery had been planned jointly, and that the defendant participated in attempting to execute the plan. There was evidence that the victim's customary practice was to answer the doorbell only for an individual known to him or known through a mutual friend. The jury could reasonably infer that the defendant, as a regular customer of the victim, knew the procedure the victim followed before admitting visitors, and that he knew that the victim kept both money and illegal drugs in his apartment. The evidence that two of the three men, their heads "covered" by hats or hoods, entered the apartment building while one man remained behind appearing to ring the bell was sufficient for the jury reasonably to infer that this was part of a plan to rob the victim, leading him to believe that only one man was entering the building, and catching him off guard when confronted by three.

The events that transpired inside the apartment are additional evidence that the defendant participated in the venture, specifically the timing of the defendant's conversation with the victim, then the admonition, "Run him. Run him," followed by several

___

[17]The defendant challenges on several grounds the reliability of Murphy's testimony. This was a proper subject of cross-examination, which trial counsel pursued. It is for the jury to make a determination of credibility. *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986) (fact finder must determine weight and credibility of evidence). Such a determination does not inform whether there was sufficient evidence of the crime. See, e.g., *Commonwealth* v. *Blanchette*, 54 Mass. App. Ct. 165, 175 (2002) (in making determination of sufficiency of evidence, judge is not to look to whether she herself is persuaded by evidence but, rather, whether evidence is of suitable quality to allow action to be placed before trier of fact).

shots a few seconds later. The jury could reasonably have inferred, as the prosecutor argued, that the statement, "Run him. Run him," was a preplanned signal to one of the coventurers to start the robbery. That inference is bolstered by the fact that no more than a few seconds passed before several shots were fired.

The defendant argues that there was no evidence that he knew that anyone was carrying a weapon.[18] In the circumstances of this crime, the jury could reasonably make such an inference. See *Commonwealth* v. *Netto*, 438 Mass. 686, 702-703 (2003). The victim was a known dealer of illegal drugs who kept an unlicensed gun in the cushions of his sofa. Offenses concerning the trafficking of illegal drugs "frequently involve drug dealers being armed and . . . in many cases, shootings and killings occur when . . . a drug deal goes 'bad,' or when others try to steal the drugs." *Commonwealth* v. *Hines*, ante 183, 189 (2007). See *Commonwealth* v. *Moses*, 408 Mass. 136, 143 (1990) ("drug trafficking is fraught with violence"); *Commonwealth* v. *Va Meng Joe*, 40 Mass. App. Ct. 499, 510 n.13 (1996), *S.C.*, 425 Mass. 99 (1997) ("frequent association of guns with drug dealing . . . has been noted in appellate decisions"). In the circumstances present here, "there was evidence of a common venture, and a person joining a robbery under conditions like the present, and apprehending that the intended victim might resist, could suppose that the other actors might be furnished with weapons." *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974).[19] The defendant showed consciousness of guilt by looking "scared" when Murphy saw him in the apartment. He failed

---

[18]In *Commonwealth* v. *Watson*, 388 Mass. 536, 544 (1983), *S.C.*, 393 Mass. 297 (1984), we held that a defendant "could not be guilty of murder in the course of the commission of armed robbery unless he knew that [a coventurer] had a gun. Such a factual finding is essential to a finding that [the defendant] was guilty of felony-murder."

[19]In *Commonwealth* v. *Jimenez*, 438 Mass. 213, 220 (2002), we held that to obtain a "no-knock" warrant and invade the dwelling of suspected traffickers in illegal drugs, a police officer must demonstrate through particular facts and circumstances that the safety of the police is in jeopardy (presuming the warrant is based on concerns for safety as opposed to possible destruction of evidence). Our decision today does not implicate the constitutional considerations inherent in our search and seizure doctrine. Here we reach our conclusion by considering the perspective of the perpetrator, not a government actor.

to telephone 911 or render aid to the victim, whom he knew, when the victim lay bleeding on the floor from multiple bullet wounds. The defendant made no attempt to disassociate himself from his two cohorts, but fled the building with them, then "screech[ed]" away in a car with no headlights, even though he lived on the same street as the victim, just minutes away. See *Commonwealth* v. *Tracy*, 27 Mass. App. Ct. 455, 457-458 (1989) (presence in getaway car during or shortly after armed robbery is evidence from which jury could infer knowledge of gun). In light of all this, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant was a joint venturer in an attempted armed robbery.[20]

The defendant challenges the use of attempted armed robbery as a predicate felony to support a conviction of murder in the first degree, arguing that "armed robbery is not a life felony." The law in this regard is clear: murder in the attempted commission of an armed robbery is adequate to support a conviction of murder in the first degree under a theory of felony-murder. See G. L. c. 265, § 1 (defining murder in first degree as murder "committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in commission or attempted commission of crime punishable with death or imprisonment for life"); G. L. c. 265, § 17 (punishment for armed robbery is "imprisonment in the state prison for life or for any term of years"). See also *Commonwealth* v. *Evans*, 390 Mass. 144, 151 (1983) (defendant who kills victim in commission or attempted commission of robbery while armed with gun guilty of murder by application of felony-murder rule).

3. *Joint venture jury instruction.* The defendant argues that the judge's supplemental instruction on joint venture in regard to armed robbery allowed the jury to convict the defendant as a

---

[20]The evidence was not sufficient to support a finding beyond a reasonable doubt that the defendant was guilty of murder as a joint venturer on the theory of extreme atrocity or cruelty. There is no evidence and no reasonable inference from the evidence that the defendant shared the intent to shoot the victim twice in the neck and once in the wrist. Such a showing is necessary for the jury to find beyond a reasonable doubt that the defendant was a joint venturer based on the theory of extreme atrocity or cruelty. See *Commonwealth* v. *Podlaski*, 377 Mass. 339, 347 (1979) (person can be guilty of murder based on extreme atrocity or cruelty by means of participation in joint venture of beating by sharing intent with principal).

joint venturer without any evidence that he knew his coventurer was armed. See *Commonwealth* v. *Christian*, 430 Mass. 552, 566 (2000) (to establish joint venture in armed robbery prosecution, Commonwealth must prove defendant knew joint venturer was armed with weapon during commission of crime).

During their deliberations the jury asked, "Do we have to find that the defendant was armed himself with a dangerous weapon to find him guilty of attempted armed robbery or is finding him a joint venturer in an act in which his accomplice was armed with a dangerous weapon sufficient?" After conferring with counsel the judge responded "no" to the first part of the question and "yes" to the second part.[21] Her answers were correct, and there was no objection to them. Defense counsel did, however, ask the judge to "remind" the jury that they were required to find that the defendant had knowledge that another coventurer had a weapon. She declined to do so, and it is this ruling that the defendant now challenges.

There was no error. In responding to the jury's inquiry, she reminded them that the burden was on the Commonwealth to prove every element of the crime, and directed the jury to the relevant portions of her instructions, which they had in writing. The jury did not direct their question to the defendant's knowledge that his coventurer was armed. Had the judge not limited her response to the two questions posed by the jury, they may have been misled about the necessity of finding other elements of the crime to which she made no reference. The judge correctly answered the questions asked. Nothing more was required.

4. *Severance.* The defendant argues that he suffered "unfair prejudice" because the judge denied his motion to sever the

---

[21]The judge's full response to the jury's question was: "I see this as two different questions and I'm going to answer it very simply dividing it into two questions. In answer to the first part of that question . . . the answer is simply 'no.' To the second half of that question . . . the answer is, 'yes.' Again, I want to underscore that the instructions, copies of which you have received, you are to apply those instructions and any relevant portions thereof, reminding you, of course, that the burden of proving every element of the crime and proving joint venture is always on the prosecution to prove that beyond a reasonable doubt. The simple answer to those two questions, 'no' to the first, 'yes' to the second."

indictment of unlawful possession of a sawed-off shotgun from the other indictments. The possession of a sawed-off shotgun, he argues, "had no fair relevance" and was used only to bias the jury against his character by allowing the jury to infer that he was a violent person. Because the defendant was acquitted of this indictment, and because he is to have a new trial, we need not consider whether the offenses were so unrelated as to support a conclusion that the judge's decision not to sever the charges was an abuse of discretion. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 32 (1982) (reviewing court need not consider question whether severance was error because of reversal on other grounds).

5. *Promises, rewards, or inducements.* The defendant requested, but the judge declined to give, an instruction that the jury consider any promises, rewards, or inducements by the Commonwealth that may have affected the credibility of Murphy, the eyewitness who identified the defendant. The instruction should have been given, he argues, because there was evidence that Murphy herself had participated in the victim's drug dealing, but had not been questioned about or prosecuted by the police for any such activity. Murphy also could anticipate being shielded from criminal prosecution for initially concealing crime scene evidence and giving false answers to police questions, the defendant argues, if she testified as the police might (in his words) "request[] or expect[]" of her. Because the issue may arise at a new trial, we address it briefly in the context of the evidence at the first trial, recognizing that the evidence at a new trial may be different and may warrant a different ruling.

There was no basis in the evidence at trial that Murphy herself had engaged in any unlawful drug dealing, nor was there any evidence that Murphy had received any promises, rewards, or inducements from the Commonwealth. During cross-examination, and again in his closing argument, defense counsel attacked Murphy's credibility, pointing to her knowledge of the drug activity taking place in her apartment, her inconsistent statements to the police, and the failure of the police to prosecute her for these actions and inactions. These subjects were, of course, a proper subject of cross-examination. *Commonwealth* v. *Michel*, 367 Mass. 454, 459 (1975), *S.C.*, 381 Mass. 447 (1980). Both in

his cross-examination of Murphy and in his closing, defense counsel was also able to highlight Murphy's inclination to fabricate her story based on hopes or expectations of leniency. The jurors could have found that Murphy was biased against the defendant; they could have found that Murphy's testimony was contrived because she was at risk of prosecution for her actions in the wake of the killing, and the defendant was accorded "reasonable cross-examination" for the purpose of showing such bias. *Commonwealth* v. *Doherty*, 394 Mass. 341, 350 (1985), quoting *Commonwealth* v. *Martinez*, 384 Mass. 377, 380 (1981). Cf. *Commonwealth* v. *Birks*, 435 Mass. 782, 787 & n.4 (2002) (hopes and expectations of cooperating codefendant relevant to questions of bias and motivation are fair game for cross-examination). In the absence of any evidence of any understanding or agreement between Murphy and the Commonwealth, however, no instruction that the jury consider any promises or inducements was required. We do not consider whether any instruction may be required if the defendant is tried again, for we cannot anticipate the evidence pertaining to Murphy.

6. *Grand jury testimony in evidence and remaining issues.* At the time of the trial, Maria Andrade, who had witnessed the coventurers enter and leave the victim's apartment building, was unavailable to testify.[22] By agreement of both the defendant and the Commonwealth, her grand jury testimony was read in evidence. The defendant now argues that he was deprived of the opportunity to cross-examine Andrade in violation of his confrontation rights under art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution, citing *Crawford* v. *Washington*, 541 U.S. 36, 68 (2004) (failure to afford opportunity to cross-examine violates Federal Constitution; doctrine applies to grand jury testimony), and that his trial counsel's agreement that Andrade's grand jury testimony be admitted in evidence constituted ineffective representation by counsel. If the defendant has a new trial, Andrade may be available as a witness. If she is again not available, we cannot speculate as to what defense counsel may or

---

[22]At the suggestion of the Commonwealth, the judge informed the jury that Andrade was beyond the subpoena powers of the court because at the time she was living outside the United States.

may not agree to concerning her grand jury testimony, for tactical or any other considerations. We decline to address the question.

Because there is to be a new trial, we also need not consider the defendant's remaining claims to the effect that a statement by Murphy constituted improper propensity evidence,[23] that the prosecutor's remarks in closing argument were improper, and that the assistance of counsel that the defendant received was ineffective.

7. *Conclusion.* The jury verdict did not specify whether the conviction of murder in the first degree was premised on a theory of principal or joint venture liability. If the evidence had been sufficient to convict under either theory, the verdict would have been sound: the law is clear that in such circumstances the jury need not be unanimous as to the theory upon which they find a defendant guilty. Here we reverse the conviction and set aside the verdict. *Commonwealth* v. *Plunkett*, 422 Mass. 634, 635 (1996). We remand this case to the Superior Court for a new trial on a theory of joint venture only.

*So ordered.*

---

[23]During defense counsel's cross-examination of Murphy, and in reply to a question he asked, Murphy testified that, on one occasion when the defendant had visited the apartment, she heard the defendant say to the victim, "Let me have a nice size bag because I spent the weekend in jail."