## COMMONWEALTH *VS.* ENRIQUE CABRERA.

No. 09-P-274.

Suffolk. January 13, 2010. - February 25, 2010.

Present: GRASSO, COHEN, & SIKORA, JJ.

*Practice, Criminal,* Motion to suppress. *Constitutional Law,* Search and seizure, Reasonable suspicion, Investigatory stop. *Search and Seizure,* Threshold police inquiry, Reasonable suspicion, Protective frisk. *Threshold Police Inquiry. Controlled Substances. Firearms.*

A Boston Municipal Court judge erred in granting a criminal defendant's motion to suppress a firearm and other evidence seized by police officers during a patfrisk of the defendant, where the seemingly innocent activities of the defendant and his companions, viewed through the eyes of experienced police officers and as a whole, provided reasonable suspicion that they were engaged in a drug deal of more than inconsequential magnitude and that a threshold detention and further inquiry were in order [344-347]; and where the situation encountered by police (i.e., outnumbered five to two, at night, in a dead-end alley), viewed collectively and not in isolation, gave rise to the requisite safety concerns justifying a patfrisk [347-350].

COMPLAINT received and sworn to in the Central Division of the Boston Municipal Court Department on February 21, 2008.

A pretrial motion to suppress evidence was heard by *David Weingarten, J.*

An application for leave to prosecute an interlocutory appeal was allowed by *Judith A. Cowin,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

*Elisabeth Kosterlitz,* Assistant District Attorney, for the Commonwealth.

*Patricia A. DeJuneas* for the defendant.

GRASSO, J. On October 15, 2007, Boston police officers arrested the defendant, Enrique Cabrera, after a patfrisk revealed that he was unlawfully carrying a loaded firearm. The defendant

moved to suppress the firearm and other evidence seized, and after an evidentiary hearing, a judge of the Boston Municipal Court allowed the defendant's motion.[1] The judge concluded that the police lacked the requisite reasonable suspicion of criminal activity to stop the defendant and the requisite reasonable apprehension of danger to frisk him.

A single justice of the Supreme Judicial Court allowed the Commonwealth's application for an interlocutory appeal from the allowance of the defendant's motion to suppress. See Mass. R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501 (1996). The case is now before us on the Commonwealth's interlocutory appeal. For the reasons that follow, we reverse the order of suppression.

1. *Facts.* We summarize the facts, supplementing the judge's factual findings "with uncontested testimony from the suppression hearing, . . . mindful that assessment of witness credibility is the province of the motion judge." *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 12 (2005) (citation omitted). On October 15, 2007, at around 10:00 P.M., Boston police Detectives Greg Walsh and Michael Feeney were patrolling in plain clothes in an unmarked Jeep sport utility vehicle in the vicinity of the Cathedral Housing Project in the South End section of Boston.[2] In the course of their patrol, they observed a grey Chrysler 300 automobile with Virginia license plates and three occupants, which was not remarkable for any reason other than its out-of-State license plate. Because it was a slow night, the officers decided to run a check on the vehicle's plate. The check disclosed that the car was a rental vehicle, a fact that was significant to Walsh, who had extensive experience in drug investigations. In Walsh's experience, rental vehicles are often "tools of the trade" for persons involved in drug distribution and other illegal activities.[3]

Walsh and Feeney followed the Chrysler at a distance as it

---

[1] The judge also denied the Commonwealth's motion to reconsider.

[2] The unmarked Jeep was not equipped with blue lights, sirens, or other emergency equipment common to police vehicles.

[3] A rental vehicle is not as readily subject to seizure and can be easily exchanged for a different make and model. As well, occupants of a rental vehicle can more easily disclaim knowledge of drugs or other contraband discovered inside.

traveled to the Massachusetts Bay Transportation Authority's Back Bay Station on Dartmouth Street, a location known for drug dealing. En route, the officers did not observe the Chrysler commit any motor vehicle violations or its occupants engage in any actions indicative of criminal activity.

Just after the Chrysler passed the Back Bay Station, it made a U-turn on Dartmouth Street and pulled over to the curb. After a few seconds, the Chrysler pulled back into traffic in the opposite direction. As it did, a gray Volkswagen Jetta automobile with tinted windows began to follow the Chrysler. The officers observed no signals, waving of the hands, or other acknowledgments exchanged between the two vehicles or their occupants.

The officers followed the two vehicles at a distance for several blocks. As they did, they ran a check on the Volkswagen's license plate and learned that the vehicle was registered to an individual named Mary Ortiz Gementis from Southbridge. Upon reaching 365 Massachusetts Avenue, a multi-unit apartment building, the two vehicles pulled into a dead-end public alley that ran along the side of the building. Without blocking egress, the officers positioned their unmarked vehicle at the beginning of the alley. From that vantage, the officers saw the vehicles come to a stop and park in two parking spaces along the left-hand side of the alley.[4]

The officers observed the operator of the Chrysler, later identified as Emilio Rosado-Lara, exit the vehicle and meet up with the defendant, who exited the driver's side of the Volkswagen. The two men entered a common hallway in the rear of 365 Massachusetts Avenue. Meanwhile, the two passengers (later identified as David Medina and Carlos Reyes) exited the Chrysler, as did the passenger in the Volkswagen (later identified as Francisco Agron). The three men stood near the cars and began talking.

Suspecting that a drug transaction was afoot, the officers drove down the alley and parked their unmarked vehicle without blocking the Chrysler or the Volkswagen. With their badges displayed conspicuously from their necks, the officers approached the three men standing alongside the two vehicles. Detective Feeney asked them who owned the Volkswagen, which was still

---

[4]Lights mounted on the back of the building illuminated the area. Also posted along the wall were several "No Trespassing" signs.

idling with no operator or passenger inside. The men responded by shaking their heads to indicate that they did not know to whom the car belonged, a response that the officers considered untruthful. As this was occurring, Walsh noticed Medina take out his cellular telephone, place it down by his side, and attempt to dial a number. Concerned that Medina was attempting to alert someone to the presence of the police, Walsh asked Medina to stop and put the telephone away. Medina then told Walsh that he lived at 365 Massachusetts Avenue, that Reyes was his uncle, and that Agron was a friend of theirs.

As Medina explained this, the rear door to 365 Massachusetts Avenue opened and Rosado-Lara came out, followed closely by the defendant. The men appeared surprised by the officers' presence in the alleyway. Rosado-Lara made eye contact with Walsh and abruptly turned around and attempted to go back inside, bumping into the defendant. Because the door had shut and locked, the men could not reenter. Both Rosado-Lara and the defendant began looking around nervously, scanning the scene. They looked to Walsh as if they wanted to flee.

Walsh did not know precisely why Rosado-Lara and the defendant were acting as they did, but considering what he and Feeney had observed and the fact that they were outnumbered and in an alley with only one route of egress, he was fearful for his safety and decided that a patfrisk for weapons was in order. Walsh ordered the five individuals to place their hands on the top of one of the cars and called for backup to assist in the patfrisk. While waiting for backup to arrive, all the men complied with Walsh's order.[5]

Within two minutes of Walsh's call, Officers Donga and Hynes and Sergeant Detective Fitzpatrick arrived on the scene. At Walsh's direction, Donga conducted a patfrisk of the defendant and found a gun loaded with five rounds in the rear pocket of the defendant's baggy jeans.

2. *Discussion.* "[W]e accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth v. Costa,* 65 Mass. App. Ct. 227, 229-230 (2005), quoting from

---

[5]The judge expressly discredited Walsh's assertion that the men took their hands off the vehicle several times before ultimately complying.

*Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004). Although the judge's subsidiary factual findings are supported by the record, we disagree with his conclusion that the police lacked reasonable suspicion of criminal activity to justify a stop, see *Commonwealth* v. *Moses,* 408 Mass. 136, 140 (1990), and reasonable apprehension of danger to justify a frisk. See *Commonwealth* v. *Mercado,* 422 Mass. 367, 369-370 (1996).

We view the case as presenting another example of the increasingly fine, and sometimes indiscernible, line between conduct that is permissible under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights and conduct that is not. Compare *Commonwealth* v. *DePeiza,* 449 Mass. 367, 371-372 (2007) (defendant's straight-arm gait and shielding of his side from view provided reasonable suspicion that he possessed firearm unlawfully), and *Commonwealth* v. *Johnson,* 454 Mass. 159, 163-164 (2009) (officers investigating possible trespass in high crime area "not required to accept risk of . . . ambiguity" posed by defendant who disregarded command to take his hands out of his pockets), with *Commonwealth* v. *Gomes,* 453 Mass. 506, 512-514 (2009) (although stop of defendant was properly based on reasonable suspicion of drug activity, no reasonable safety concern supported frisk). On balance, we conclude that the facts known to the police at the time they ordered the defendant to put his hands on the car sufficed to support a stop and a patfrisk for weapons.

a. *Reasonable suspicion and the stop.* The stop of the defendant in the constitutional sense did not occur until Walsh directed the defendant and his companions to place their hands on top of the car.[6] See *Commonwealth* v. *DePeiza, supra* at 370-371 (no seizure when police stepped from unmarked vehicle and engaged in conversation with defendant); *Commonwealth* v. *Gomes, supra* at 510 (no seizure of defendant until officer conducted patfrisk); *Commonwealth* v. *Martin,* 73 Mass. App. Ct. 526, 530-532 (2009) (same). Prior to that time, the police neither

---

[6]To the extent that ordering Medina to put away his cellular telephone may have effected a stop of Medina, the defendant has no basis for challenging that action. See *Commonwealth* v. *Montanez,* 410 Mass. 290, 301 (1991) (determination turns on whether police conduct has intruded on constitutionally protected privacy interest of defendant).

commanded the defendant to stop nor displayed any indicia of authority to signal that he was not free to leave. See *Commonwealth* v. *Williams*, 422 Mass. 111, 116 (1996) (merely following without activating lights and siren not stop in constitutional sense); *Commonwealth* v. *Sykes*, 449 Mass. 308, 314 (2007) (stop did not occur until police left cruiser and began chasing defendant). Indeed, the officers had no interaction with the defendant at all until he and Rosado-Lara emerged from the building.

By the time the officers commanded the defendant to place his hands on the car, specific and articulable facts supported a reasonable suspicion that a drug deal was occurring and that a threshold detention and further inquiry were in order. See *Commonwealth* v. *Santaliz*, 413 Mass. 238, 242 (1992) (in eyes of experienced narcotics investigator, whole "silent movie" disclosed sequence of activity consistent with drug sale); *Commonwealth* v. *Kennedy*, 426 Mass. 703, 710-711 (1998) (even though officer did not see what was exchanged, his training, education, and knowledge supported reasonable suspicion of drug transaction); *Commonwealth* v. *Stephens*, 451 Mass. 370, 384-385 (2008) (reasonable suspicion of drug transaction arose from observations by experienced officers).

Detectives Walsh and Feeney observed two motor vehicles from outside the Boston area meet at a known rendezvous for drug transactions. One was a rental vehicle, a known tool of the drug trade. Without exchanging signals, the vehicles proceeded in concert to a location out of public view, a dead-end alley. There, one individual from each vehicle met and went inside a building for less than a minute while the other occupants remained outside. From the officers' perspective, it was reasonable to suspect that the remaining occupants were acting as lookouts and that the defendant left his vehicle's engine idling to allow for a quick departure should the need arise. Viewed through the eyes of experienced police officers and as a whole, even seemingly innocent activities may take on a sinister cast and give rise to reasonable suspicion. See *Commonwealth* v. *DePeiza*, 449 Mass. at 373 (police may rely on experience and training as basis for reasonable suspicion); *Commonwealth* v. *Sykes*, 449 Mass. at 314.

Adding to the officers' suspicion that a drug deal was afoot

was the evasive response of the occupants to their inquiry regarding ownership of the Volkswagen, Medina's surreptitious attempt to make a call (an action that reasonably could be construed as an attempt to warn the defendant or others of the presence of the police), and the behavior of the defendant and Rosado-Lara who, at the mere sight of the police, tried unsuccessfully to reenter the building and then looked nervously about the alley as if searching for a place to flee. See *Commonwealth* v. *Sykes, supra; Commonwealth* v. *Wilson,* 52 Mass. App. Ct. 411, 415 (2001), and cases cited (flight from police a relevant factor when not triggered by inappropriate police action); *Commonwealth* v. *Monteiro,* 71 Mass. App. Ct. 477, 480 (2008) (same).

Moreover, from all that appeared to the officers, the deal was more than a casual drug transaction at street level. The number of participants, the use of a rental vehicle with out-of-State plates, and the measures taken to avoid detection reasonably suggested that the five individuals were engaged not in an isolated, hand-to-hand street-level sale, but a drug deal of more than inconsequential magnitude. See *Commonwealth* v. *Kennedy,* 426 Mass. at 710-711. Indeed, the facts known to the officers reasonably supported the conclusion that it was highly unlikely that five individuals, in vehicles registered outside the locale, would meet in Boston to conclude a drug transaction unless the deal were of such a magnitude as to justify the time and expense. That there may have been an innocent explanation for the actions of the defendant and his cohorts does not remove those actions from consideration in the reasonable suspicion analysis. See *Commonwealth* v. *Gomes,* 453 Mass. at 511. In sum, when the facts and inferences underlying the officers' suspicions are viewed in their totality, they constitute more than a hunch; they add up to reasonable suspicion. See *id.* at 512.

b. *Reasonable apprehension of danger and the frisk.* For a stop or for a frisk, the inquiry is whether, viewed objectively, the facts available to the officer at the moment of the seizure (the stop) or the frisk (the weapons search) would "warrant a [person] of reasonable caution in the belief that the action taken was appropriate." *Terry* v. *Ohio,* 392 U.S. 1, 21-22 (1968). Not every stop justifies a frisk. Even when police possess reasonable suspicion of criminal activity, a frisk is only permissible when, viewed objectively, there is a reasonable apprehension of

danger to the police or others. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997). "Two questions arise in connection with a determination whether a police officer had a sufficient, reasonable basis to conduct a patfrisk: (1) was the officer rightfully in the presence of the party who was ultimately frisked; and (2) did the officer have a reasonable basis to suspect that this party was likely to be armed and dangerous." *Commonwealth* v. *Johnson*, 454 Mass. at 162. As just discussed, the police possessed reasonable suspicion of criminal activity and were rightfully in the presence of the defendant when they ordered him and his companions to put their hands on the roof of the car and submit to a frisk.

Whether the officers had a reasonable basis to suspect that the defendant was likely to be armed and dangerous presents a closer question that is dependent on more than a single factor. A reasonable apprehension of danger may arise from the type of crime being investigated, the likelihood that a defendant is armed and dangerous, or both in combination. The extent of the danger is central to "assessing whether the force used by the police in the encounter was commensurate with their suspicion." *Commonwealth* v. *Willis*, 415 Mass. 814, 820 (1993).

Here, the crime under investigation was not a crime of violence, or one involving the possession or use of a dangerous weapon. See *Commonwealth* v. *Vesna San*, 63 Mass. App. Ct. 189, 193 (2005) (given crime under investigation, police entitled to determine whether individuals were armed and posed danger). Nor had the police received a report of a firearm or a dangerous weapon being brandished. See *Commonwealth* v. *Fraser*, 410 Mass. 541, 546 (1991); *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 676-677 (2000). Rather, the police had reasonable suspicion only that a drug deal was occurring, albeit one of some magnitude.

We acknowledge that the case law often observes that the mere fact that drugs are involved does not support the view that guns or other weapons are present. "[W]hile drug involvement certainly may be a relevant factor in assessment of threats to police safety, we are reluctant to adopt a blanket rule that all persons suspected of drug activity are to be presumed armed and dangerous for constitutional purposes." *Commonwealth* v. *Washington*, 449 Mass. 476, 482-483 (2007). Cf. *Commonwealth*

v. *Jimenez*, 438 Mass. 213, 220 (2002) (general averment that it is common for drug dealers to possess firearms insufficient to establish probable cause for "no knock" search warrant); *Richards* v. *Wisconsin*, 520 U.S. 385, 390-392 (1997). We also recognize that Detectives Walsh and Feeney observed no bulges in the defendant's clothing that would suggest that the defendant was armed and dangerous. Compare *Commonwealth* v. *DePeiza*, 449 Mass. at 372. Nor did the defendant or any of his companions make furtive gestures or ignore the officers' commands to keep their hands on the car.[7] Compare *Commonwealth* v. *Johnson*, 454 Mass. at 163-164. Nevertheless, viewed collectively and not in isolation, the situation encountered by the police gave rise to the requisite safety concerns justifying a frisk. See *Commonwealth* v. *Nestor N.*, 67 Mass. App. Ct. 225, 230 (2006).

As discussed, the suspected drug activity was not an isolated sale between two individuals at street level, but a transaction of sufficient magnitude to occupy five men, two vehicles, and precautions designed to minimize police surveillance. The officers found themselves outnumbered five to two, at night, and in a dead-end alley. They knew nothing of the defendant or the other individuals, or whether any other participants might remain inside the building.[8] In such a rapidly developing circumstance, it was neither imprudent nor constitutionally unreasonable for the police to view the whole as greater than the sum of its parts and conclude that sufficient danger existed to merit a patfrisk and that backup was required to do so safely. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 325 (2001).

Nor did the arrival of backup render a frisk unnecessary. See *Commonwealth* v. *Torres*, 433 Mass. 669, 676 (2001) (arrival of backup officers prior to frisk does not diminish justification for frisk). It would be a perverse principle were police who possess the authority to frisk but are reasonably fearful of doing so to lose that authority when sufficient backup arrives to conduct

---

[7]As discussed, the motion judge specifically discredited the claim that the defendant or any of his companions failed to comply with the officers' command to keep their hands on top of the car until backup arrived. See note 5, *supra.*

[8]The officers were not required to believe Medina's assertion that he lived at 365 Massachusetts Avenue. Medina had attempted to use his cellular telephone to alert someone to the presence of the police and did not tell the police that he lived there until after he was caught attempting to make a call.

the frisk safely. See *Commonwealth* v. *Willis*, 415 Mass. at 820-821 (patfrisk permissible where officers outnumbered defendant and approached with guns drawn).

*Commonwealth* v. *Gomes*, 453 Mass. at 512-513, does not dictate a different result. There, a majority of the court concluded that the police lacked a reasonable basis for concluding that a sole defendant engaged in a hand-to-hand street-level drug sale in the open doorway of a building that fronted a street in the heart of the theater district was armed and dangerous. The situation encountered by police here is markedly different and presents obvious dangers that were lacking in *Gomes*. As the Supreme Judicial Court has observed, "While a mere hunch is not enough, . . . it does not take much for a police officer to establish a reasonable basis to justify [a] . . . search based on safety concerns, and if the basis is there, a court will uphold the order." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999) (internal citation omitted). The police are "not required to gamble with their personal safety," *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990); see *Commonwealth* v. *Feyenord*, 445 Mass. 72, 75-76 (2005), and are entitled to take reasonable precautions for their protection. See *Commonwealth* v. *Willis*, 415 Mass. at 817; *Commonwealth* v. *Johnson*, 454 Mass. at 164. Here, the police response was reasonable and proportional to the danger, and we are loath to second guess that judgment. See *Commonwealth* v. *Willis*, *supra* at 819-820; *Commonwealth* v. *Stampley*, 437 Mass. 323, 327-328 (2002).

> *Order allowing motion to suppress reversed.*