NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-1009                                          Appeals Court

COMMONWEALTH  vs.  WILFREDO SANTIAGO.

No. 17-P-1009.

Essex.       April 4, 2018. - August 22, 2018.

Present:  Rubin, Sacks, & Singh, JJ.

Firearms.  Constitutional Law, Search and seizure, Probable
     cause, Arrest.  Search and Seizure, Motor vehicle, Probable
     cause, Arrest.  Probable Cause.  Arrest.

Indictments found and returned in the Superior Court
Department on October 15, 2014.

A pretrial motion to suppress evidence was heard by James
F. Lang, J., and the cases were tried before Mary K. Ames., J.

Edward Crane for the defendant.
David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.

SACKS, J.  Following a jury trial, the defendant was

convicted of possession of a firearm, second offense,[1] and

_____

[1] After a jury trial on the underlying charge, the defendant
pleaded guilty to the subsequent offense portion of the
indictment.

possession of a loaded firearm. On appeal, the defendant argues that a Superior Court judge (motion judge) erred in denying his motion to suppress the firearm and some cash discovered during a stop of the vehicle in which the defendant was a passenger. The defendant asserts that police conduct during the stop -- including boxing the vehicle in and approaching with guns drawn -- escalated the encounter to an arrest, for which probable cause was lacking.

After considering the circumstances as a whole, we conclude that the officers' show of force was sufficiently significant to convert the stop to an arrest. Because the Commonwealth concedes that there was no probable cause to arrest the defendant at the time, the motion to suppress should have been allowed. Accordingly, we reverse the convictions.

1. Background. We summarize the motion judge's detailed findings of fact, supplementing with additional facts from testimony that the judge implicitly credited. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). Here, the defendant concedes that police had reasonable suspicion to conduct an investigatory stop of the vehicle in which he was traveling, based on evidence of drug dealing as well as traffic violations. We therefore focus our recitation on the facts relevant to the defendant's challenge on appeal.

In the summer of 2014, State police were conducting an investigation into suspected drug dealing in Lawrence, centering on the defendant, and using a confidential informant. During the investigation, officers determined that the defendant was known to the Lawrence police and had a prior conviction of a firearms offense. The confidential informant told police that the defendant was selling cocaine and was "involved with firearms."

On August 6, 2014, police initiated surveillance of the defendant based on the informant's report that the defendant would be traveling to Lynn to pick up cocaine to bring to Lawrence. The surveillance team comprised multiple officers from the State police, the Federal Drug Enforcement Administration, and the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives, in unmarked vehicles. During the course of the surveillance, officers observed the defendant, along with three other men about whom police apparently had no information,[2] depart a home in Lawrence in a red GMC Envoy sport utility vehicle. The defendant was seated in the right rear passenger's seat. The surveillance team followed the GMC surreptitiously. After making a number of stops in Lawrence and then in Lynn, at about 6:00 P.M. the defendant and his

---

[2] There was no evidence at the suppression hearing that officers knew the men's identities or of any criminal history they may have had.

companions proceeded in the GMC to Route 114 westbound toward Lawrence.

When the GMC reached a point where the road widened from one to two lanes and motorists often accelerate to pass slower vehicles, it suddenly more than doubled its speed, operating well over the posted speed limit. Believing that the GMC's occupants had detected the surveillance, officers decided to stop the GMC, rather than waiting for its expected return to Lawrence, as they had originally planned.

Officers contacted a uniformed State trooper who was patrolling the area in a marked cruiser and asked him to stop the vehicle. The trooper observed the GMC cross the double yellow line in the middle of the road twice. He turned on his cruiser's flashing lights, and the GMC pulled over promptly. The trooper's cruiser and at least three other unmarked police cars moved in around the GMC, effectively boxing it in.

Four or five officers simultaneously approached the GMC's four doors, yelling for the occupants to raise their hands. At least two of the officers had their guns drawn. As one officer neared the GMC, he observed the defendant, who was still sitting in the right rear passenger's seat, reach forward, pull open the seat-back pocket in front of him, and stuff an object into it. Suspecting that the defendant had attempted to conceal a firearm, the officer opened the left rear door and ordered the

rear seat passengers not to move.  He observed a firearm in the seat-back pocket in front of the defendant.

Officers ordered the defendant and other passengers out of the GMC and recovered a loaded revolver from the seat-back pocket.  The defendant was arrested and searched, and just under $5,500 in cash was found on his person.  No drugs were found.

2.  Discussion.  The defendant agrees on appeal that the stop of the GMC was lawful and supported by observed traffic violations as well as reasonable suspicion of drug dealing.  He maintains, however, that his motion to suppress was improperly denied because police conduct escalated the seizure to an arrest without probable cause.[3]  We agree.

In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings unless clearly erroneous, see Commonwealth v. White, 374 Mass. 132, 137 (1977), aff'd, 439 U.S. 280 (1978), and make an "independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.'"  Commonwealth v. Haas, 373 Mass. 545, 550 (1977), S.C., 398 Mass. 806 (1986), quoting from Brewer v. Williams, 430 U.S. 387, 403 (1977).

---

[3] Based in part on concerns about the reliability of the confidential informant, the motion judge concluded that "[u]nquestionably, the police did not have probable cause to arrest at the time that the stop was made," and on appeal, the Commonwealth concedes the point.

"The Constitution does not require officers 'to gamble with their personal safety,' Commonwealth v. Robbins, 407 Mass. 147, 152 (1990), and police officers conducting a threshold inquiry may take reasonable precautions, including drawing their weapons, when the circumstances give rise to legitimate safety concerns." Commonwealth v. Haskell, 438 Mass. 790, 794 (2003). "Such steps do not automatically turn a stop into an arrest." Commonwealth v. Dyette, 87 Mass. App. Ct. 548, 556 (2015), quoting from Commonwealth v. Williams, 422 Mass. 111, 117 (1996).

Whether a police seizure has been transformed into an arrest "depends on the proportional relationship of the degree of intrusiveness on the defendant to the degree of suspicion that prompted the intrusion." Commonwealth v. Willis, 415 Mass. 814, 819 (1993). This determination is highly fact-specific, and in assessing the reasonableness of the officers' conduct, we view the facts and circumstances "as a whole." Williams, 422 Mass. at 116.

We have held that "[a]n approach with drawn guns is generally thought excessive in the absence of any suggestion that the defendant is armed or other circumstances suggesting the possibility of violence." Commonwealth v. Fitzgibbons, 23 Mass. App. Ct. 301, 308 (1986). Even with information suggesting that a defendant possesses a firearm illegally,

however, police are not generally justified in drawing their guns in the absence of additional "fear-provoking circumstances." Commonwealth v. Bottari, 395 Mass. 777, 782 (1985). When considering a vehicle stop, "we also look to the number of police used to effectuate the stop and whether the movement of the automobile was impeded." Commonwealth v. Sanderson, 398 Mass. 761, 766 (1986).

Here, the police response, viewed as whole, included the presence of multiple cars and officers, the use of four police vehicles to box the GMC in, and the approach of at least two officers with guns drawn. We conclude that this was disproportionate "to the degree of suspicion that prompted the intrusion" and constituted an arrest. Willis, 415 Mass. at 819. The surrounding circumstances here lacked factors present in other cases that held such precautions justified even absent probable cause.

Here, "[t]he officers' use of force was not precipitated by any actions of the defendant[], nor did the officers testify that they feared for their safety or the safety of others at the time they approached the [GMC] with their guns drawn." Bottari, 395 Mass. at 782. Though it is certainly relevant that police had information as to the defendant's prior nonspecific "involvement" in firearms and knew the defendant to have had a prior firearms conviction, they had no particular information

suggesting that he possessed a firearm at the time of the stop. Cf. Willis, 415 Mass. at 815-816, 819 (officers had detailed information that defendant with previous arrest for armed robbery was carrying loaded stolen gun at time of seizure); Haskell, 438 Mass. at 793-794 (officers received reliable report that defendant was seen publicly loading handgun in high-crime area at 2:00 A.M.); Commonwealth v. McKoy, 83 Mass. App. Ct. 309, 314 (2013) (defendant and companion were coming from direction of reported shooting, were only persons on street, and had hands in pockets).

The officers had no information about any history of violent conduct on the part of the defendant. Cf. Commonwealth v. Ruiz, 51 Mass. App. Ct. 346, 347-351 (2001) (police show of force did not transform seizure into arrest, where defendants were suspected of just having committed home invasion). Though police information regarding the defendant's possible drug dealing is relevant in our analysis, "case law often observes that the mere fact that drugs are involved does not support the view that guns or other weapons are present." Commonwealth v. Cabrera, 76 Mass. App. Ct. 341, 348 (2010). See Commonwealth v. Washington, 449 Mass. 476, 482 (2007) ("we are reluctant to adopt a blanket rule that all persons suspected of drug activity are to be presumed armed and dangerous for constitutional purposes").

We acknowledge, as the Commonwealth argues, "that drug offenses frequently involve drug dealers being armed and that, in many cases, shootings and killings occur when a drug dealer is confronted by police, when a drug deal goes 'bad,' or when others try to steal the drugs." Commonwealth v. Hines, 449 Mass. 183, 189 (2007). See Commonwealth v. Cannon, 449 Mass. 462, 470 (2007) (same). But neither Hines nor Cannon involved any question whether a police display of force was disproportionate in particular circumstances.[4] Neither decision suggested that police are justified in drawing their weapons whenever they approach a drug suspect.[5] Cf. Commonwealth v. Jimenez, 438 Mass. 213, 216-220 (2002) (that drug dealers may often have guns does not justify no-knock search warrant in every drug case; what is required is probable cause to believe

---

[4] The court in Hines made the quoted observation in support of its interpretation of a statute providing enhanced punishment for felonies when a firearm was involved. Hines, 449 Mass. at 189. In Cannon, the court repeated the observation in the course of holding that the jury could reasonably infer that the felony-murder defendant knew that one of his coventurers was carrying a weapon when they robbed a drug dealer. Cannon, 449 Mass. at 470.

[5] The Commonwealth also relies on Commonwealth v. Moses, 408 Mass. 136, 143 (1990) (drug trafficking is "fraught with violence"), and Commonwealth v. Va Meng Joe, 40 Mass. App. Ct. 499, 510 n.13 (1996), S.C., 425 Mass. 99 (1997) (noting "frequent association of guns with drug dealing"). Both of those decisions involved protective searches for weapons of drug suspects who had just made furtive gestures, not (as here) officers' display of their own weapons in effecting stops.

officer safety would be jeopardized by observing knock and announce rule in the particular circumstances).

At the time of the show of force here, police had not observed any furtive conduct by the defendant or his companions. Concerns about flight raised by the GMC's increase in speed would have been substantially alleviated when the vehicle promptly and uneventfully stopped when signaled by the marked cruiser.[6] Nor had any of the GMC's four occupants refused any police orders. Cf. Commonwealth v. Torres, 433 Mass. 669, 670-671 (2001) (officer did not escalate stop to arrest by drawing gun, after passengers in vehicle he had stopped had "bent over" to "mess[] with something" on vehicle floor and three of them failed to obey instruction to place hands on heads).

The officers were a part of an organized surveillance team comprising multiple State and Federal officers and were not outnumbered by the defendant and his companions. Cf. Cabrera, 76 Mass. App. Ct. at 349 (two officers, outnumbered by five drug suspects in dead-end alley at night, had legitimate safety concerns justifying call for backup before patfrisk). There was no evidence that the location of the stop was associated in any

---

[6] The officer who gave the order to stop the GMC testified, "[I]f they were aware of surveillance, the chance for them fleeing when [the trooper] turned the lights on, in my opinion, had just gone way up."

way with past crimes of violence.  Cf. Dyette, 87 Mass. App. Ct.
at 549, 556-557.

In urging that the police conduct here at issue was a stop
rather than an arrest, the Commonwealth relies largely on Willis
and Dyette.  That reliance is unavailing.  In Willis, the
information available to police raised significant articulable
safety concerns:  at the time of the stop, the defendant was
reasonably believed to possess a loaded, stolen handgun, and the
defendant had a prior arrest for a violent crime involving a
weapon.  Willis, 415 Mass. at 815-816, 819.  Here, the safety
concerns were considerably less substantial.  Police information
as to the defendant's history with firearms was vague and did
not involve violence, and police had no information that the
defendant possessed any firearm at the time of the stop.

Similarly, Dyette involved multiple factors raising safety
concerns not present here.  In that case, officers in an
unmarked car noticed the defendant trespassing in a park close
to midnight.  Dyette, 87 Mass. App. Ct. at 550.  The park,
closed and unlit, was known "as an area of high firearm
activity, including homicides and other shootings."  Id. at 549.
After spotting the officers, the defendant and his companion
fled, "colliding with each other as they ran."  Id. at 550.
Several officers gave chase on foot, but the defendant eluded
them until a lone officer stationed at a park exit saw him,

recognized him from "numerous" prior encounters "including a firearm arrest," and ordered him to the ground at gunpoint. Ibid.

In contrast to Dyette, where the defendant engaged in plain (and chaotic) flight from officers, and halted only after the challenged show of force, here the evidence of flight was more equivocal, and ameliorated by the prompt compliance by the driver of the GMC with the police signal to stop. Unlike in Dyette, the place of the stop in this case was neither one at which the defendant's presence was itself suspicious nor one associated with past violent crime. Additionally, Dyette involved a fleeing suspect's sudden encounter with a lone officer, who was forced to make a split-second decision about his own safety. Here the officers were engaged in a coordinated surveillance operation in which four police vehicles participated in the stop of the GMC; the officers decided when to make the stop and had time to discuss how they would proceed once the GMC pulled over.[7]

We recognize that the fact-specific decisional law in this area may at times pose a difficult dilemma for police officers: "If the officer approaches a suspect[] . . . with his gun still

---

[7] The trooper in the marked cruiser testified that he was given no information about the nature of the case and was instructed to follow the GMC and make a stop "once [he] saw a violation."

in his holster, he increases the risk that he will be shot.  If, on the other hand, he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an illegal arrest."  Fitzgibbons, 23 Mass. App. Ct. at 305, quoting from United States v. Jackson, 652 F.2d 244, 249-250 (2d Cir.), cert. denied, 454 U.S. 1057 (1981).  And we emphasize that even when police lack probable cause to arrest, they may draw their guns or otherwise show force, to protect themselves or others, when such a display is "proportional . . . to the degree of suspicion" based on all relevant circumstances.  Willis, 415 Mass. at 819.  We have discussed supra some of the numerous decisions illustrating circumstances in which officers may reasonably draw their weapons.  To those, we add Commonwealth v. Emuakpor, 57 Mass. App. Ct. 192, 193-195, 199 (2003) (two officers justified in blocking vehicle and approaching with guns drawn, where four occupants were suspected of just having committing armed robbery with gun).

We acknowledge that the question here is close, and our resolution of it necessarily "depends on the particular facts of [this] case."  Williams, 422 Mass. at 118.  We are constrained to conclude that police conduct here was not "commensurate with their suspicion."  Willis, 415 Mass. at 820.  The stop of the defendant thus constituted an arrest.  Because the Commonwealth

acknowledges that, at the time of the stop, there was no probable cause for an arrest, the defendant's motion to suppress should have been allowed.[8]

Judgments reversed.

Verdicts set aside.

---

[8] The Commonwealth has not argued that the gun would have inevitably been discovered even if the officers had not approached the stopped vehicle in the manner that they did, nor did the judge make findings on that issue. See Commonwealth v. O'Connor, 406 Mass. 112, 115-119 (1989) (discussing inevitable discovery doctrine).